# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

WASHINGTON FRONTIER LEAGUE   )
BASEBALL, LLC, and STUART A. WILLIAMS, )
               )
     Plaintiffs,      )
               )
     v.        )  Case No. 1:14-cv-01862-TWP-DML
               )
MICHAEL E. ZIMMERMAN,     )
MKE BASEBALL, LLC,       )
MKE SPORTS & ENTERTAINMENT, LLC,  )
W. CHRIS HANNERS and BRYAN WICKLINE, )
               )
     Defendants.     )
_____)
               )
FRONTIER PROFESSIONAL BASEBALL,  )
INC.,             )
               )
     Nominal Defendant[1]. )

## ENTRY ON MOTIONS FOR SUMMARY JUDGMENT

   This matter is before the Court on Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Nominal Defendant Frontier Professional Baseball, Inc. ("Frontier League") (Filing No. 176) and by Defendants Michael E. Zimmerman, MKE Baseball, LLC, and MKE Sports & Entertainment, LLC (collectively "Zimmerman Defendants") (Filing No. 213). Plaintiffs Washington Frontier League Baseball, LLC ("Washington Club") and Stuart A. Williams ("Williams") filed this derivative action on behalf of the Frontier League and themselves after the Zimmerman Defendants secured a baseball expansion opportunity in Kokomo, Indiana, which Washington Club and Williams had been pursuing. For the following reasons, the Court **denies** the Motions for Summary Judgment.

---

[1] The Frontier League is named as a nominal defendant solely in a derivative capacity. *See* Filing No. 75 at 15, ¶75.

# I.  BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Williams and Washington Club as the non-moving parties.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Williams, his wife, and another individual are the owners of Washington Club, which is a member club in the Frontier League.  The Frontier League is an independent, professional baseball league with thirteen teams.  Each Frontier League member has a team that plays in the Frontier League.  Each Frontier League member helps fund a travel team that plays in the Frontier League so that there are an even number of teams to balance out the playing schedule (Filing No. 75 at 2–5; Filing No. 78 at 4).

The Frontier League is a not-for-profit corporation organized under Ohio law and has its principal place of business in Illinois.  Frontier League's board of directors is comprised of a representative from each of the member clubs within the Frontier League.  Williams is Washington Club's representative and therefore serves as a director on Frontier League's board of directors (Filing No. 75 at 3–4; Filing No. 78 at 4; Filing No. 118 at 2–3).

One of the other Frontier League members is Rock River Valley Baseball, LLC ("Rock River Valley Club"), which is owned by Defendant W. Chris Hanners ("Hanners").  Defendant Bryan Wickline ("Wickline") was Rock River Valley Club's president and representative on Frontier League's board of directors.  Joshua E. Schaub ("Schaub") was the owner or managing member of another Frontier League member, the Joliet Slammers, and he was the director for that member team on Frontier League's board of directors (Filing No. 75 at 5; Filing No. 118 at 3; Filing No. 78 at 3).

In early March 2014, the City of Kokomo, Indiana contacted the Frontier League to discuss the possibility of placing an expansion team in Kokomo's to-be-built baseball stadium (Filing No. 216-17 at 3). On March 10, 2014, Frontier League's Commissioner Bill Lee ("Commissioner Lee"), assistant commissioner Steve Tahsler ("Tahsler"), and one of Frontier League's directors, Steve Malliet ("Malliet"), visited Kokomo and met with Mayor Greg Goodnight ("Mayor Goodnight"), Director of Operations Randy McKay ("McKay"), and the city engineer to further discuss the opportunity of placing a baseball team in Kokomo. They discussed a lease for the stadium and other related matters (Filing No. 203-1 at 4; Filing No. 58-1 at 2).

On March 11, 2014, Malliet summarized the meeting with the city officials for Frontier League's expansion committee, consisting of Schaub, Pat Salvi, and Clint Brown ("Brown"). Also on March 11, 2014, Commissioner Lee summarized the meeting for Frontier League's directors (Filing No. 203-1 at 5; Filing No. 58-1 at 3). Then on March 18, 2014, several members of the Frontier League participated in a conference call to discuss the Kokomo expansion opportunity. Hanners, Wickline, Schaub, Williams, and Malliet were among the conference call participants. The consensus from the conference call was that the members would take a unified approach to the Kokomo expansion opportunity rather than bid against each other (Filing No. 203-2; Filing No. 58-1 at 4–5).

Commissioner Lee asked Williams to assist in preparing a Memorandum of Understanding ("MOU") with Kokomo to address the Kokomo expansion opportunity. On March 19, 2014, Commissioner Lee signed the MOU on behalf of the Frontier League, and Kokomo also signed the MOU, which gave both parties the exclusive opportunity to gather more information and conduct further negotiations with one another. The MOU expired by its own terms on May 18, 2014 (Filing No. 224-1).

Before the expiration of the MOU, the Kokomo expansion opportunity was discussed at the Frontier League's board of directors meeting held on March 25, 2014 (Filing No. 58-1 at 5). At the meeting, the directors decided to hold off on any further discussions about who would participate in the Kokomo expansion opportunity until a lease was negotiated with Kokomo (Filing No. 203-8 at 9–10). The directors agreed that Brown, owner of the member club in Florence, Kentucky, would pursue the Kokomo expansion opportunity on behalf of the Frontier League and its members under the umbrella of the March 19, 2014 MOU. Williams assisted Brown whenever asked (Filing No. 203-53 at 2; Filing No. 224-10 at 2; Filing No. 203-8 at 9, 11). While the Frontier League was having discussions with Kokomo about the expansion opportunity, the Defendants were discussing the Kokomo expansion opportunity for themselves (*see, e.g.*, Filing No. 224-11).

Following some discussions and negotiations, Brown informed McKay and Commissioner Lee that he was withdrawing from the negotiations between the Frontier League and Kokomo on June 17, 2014 (Filing No. 203-21). Commissioner Lee called Williams and asked him to pursue the negotiations with Kokomo, and Commissioner Lee encouraged the Kokomo officials to visit Pennsylvania to see Washington Club's operations (Filing No. 203-8 at 14).

While the Kokomo officials were arranging a Pennsylvania visit with Williams, Hanners and Wickline met with Commissioner Lee on June 18 and 19, 2014, to ask about the status of the Kokomo expansion opportunity. Commissioner Lee told Hanners and Wickline that Williams was working on the negotiations, and they would need to talk with Williams. Also on June 19, 2014, Zimmerman met with Hanners, Wickline, and Commissioner Lee, and Commissioner Lee directed them to first talk with Williams before pursuing Kokomo (Filing No. 58-1 at 7–8).

On June 20, 2014, Mayor Goodnight, McKay, and other city officials visited the Washington Club operations in Pennsylvania with Williams. They were impressed with what they

saw and were excited to work with Williams.  Then Williams started making arrangements to visit them in Kokomo (Filing No. 203-8 at 14–15).

On June 25, 2014, Wickline emailed the Kokomo city engineer, asking to set up a meeting for Hanners with Kokomo officials.  The Kokomo city engineer forwarded the request to McKay, who coordinated a meeting with Wickline.  Wickline informed McKay that one of Hanners' partners, Zimmerman, would join them for the meeting (Filing No. 224-11).

On June 26, 2014, Hanners, Zimmerman, and Schaub met with McKay in Kokomo to discuss the opportunity of bringing a team there and securing a lease for the baseball stadium (Filing No. 203-75 at 3; Filing No. 216-20 at 2).  During the meeting, McKay exchanged text messages with Commissioner Lee, which confirmed that Schaub, Hanners, and Zimmerman were meeting with Kokomo.  Commissioner Lee encouraged McKay not to finalize anything until after he talked with Williams, to which McKay agreed (Filing No. 58-1 at 14).  McKay also emailed Williams to let him know that he had been contacted by a Rock River Valley Club representative and would be meeting with them to discuss a team in Kokomo.  McKay informed Williams that he would tell them that Kokomo was working with Williams and would hopefully be entering into a lease agreement.  Williams responded with an email expressing appreciation for being informed (Filing No. 224-2).

Williams called Commissioner Lee and said that he would not visit Kokomo to discuss Frontier League's expansion into Kokomo unless the Frontier League spoke with Hanners.  Commissioner Lee informed Williams that he would take care of it and that Williams should assume Hanners would not meet with Kokomo unless Commissioner Lee told Williams differently.  Commissioner Lee did not inform Williams differently (Filing No. 203-8 at 15–16).

On Sunday, June 29, 2014, Williams visited Kokomo (Filing No. 58-1 at 15; Filing No. 216-20 at 2). Williams perceived that the city officials' attitude toward him had changed since their visit to his Washington Club operation. In preparation for the June 29, 2014 visit, Williams had expressed his intention of finalizing the lease, but during his visit to Kokomo, Williams realized that McKay was not interested in discussing the lease. Mayor Goodnight arrived late and provided a short tour of the city but did not discuss the expansion opportunity (Filing No. 203-8 at 14–19). Then on Monday, June 30, 2014, Mayor Goodnight called Commissioner Lee to tell him that Kokomo had decided to work with Hanners and his partners (Filing No. 58-1 at 16).

On July 2, 2014, two days after Mayor Goodnight called Commissioner Lee, Frontier League's executive committee held a conference call to discuss the Kokomo expansion opportunity. Williams shared his belief that the Rock River Valley Club was soon going to close on a lease with Kokomo, and he wanted the executive committee to direct Hanners not to enter a lease until after the executive committee could review the lease and allow other Frontier League members to join the lease (Filing No. 58-1 at 16).

The executive committee asked Frontier League's attorney, Thomas Ysursa ("Ysursa"), to send a letter to Hanners asking him for an update on Kokomo, informing him that he needed Frontier League's approval before a lease could be signed, and informing him that after a lease was signed a meeting would be held to determine what other members wanted to join the expansion opportunity. However, before Ysursa could send the requested letter, he received an email from Zimmerman on July 2, 2014, which included a copy of the lease that was being presented to Kokomo. The proposed lease was between Kokomo and the Rock River Valley Club. Zimmerman informed Ysursa that "[w]e understand and empathize with other owners if they are unsettled about 'the deal.'" (Filing No. 58-1 at 17.) Zimmerman went on in his email to invite other owners to

consider entering into the expansion opportunity, which would include Kokomo and the Rock River Valley Club ([Filing No. 203-53 at 2](#)–3; [Filing No. 218-5 at 5](#); [Filing No. 75 at 10](#)–11; [Filing No. 119 at 5](#)–6; [Filing No. 58-1 at 16](#)–17).

After receiving Zimmerman's email, Ysursa sent a letter to Hanners later that day, on July 2, 2014, asserting that the Kokomo expansion opportunity was an opportunity for the Frontier League to pursue and that if Hanners failed to offer participation in the opportunity to his fellow members, he would be breaching his fiduciary duties. He noted that Hanners should "take no further action of any kind in relation to Kokomo until such time as you provide the League the opportunity to review the lease and you provide an update to the Executive Committee as to the state of your negotiations and your intentions with Kokomo." ([Filing No. 203-53 at 2](#)–3; [Filing No. 203-74 at 21](#); [Filing No. 58-1 at 17](#).)

Ysursa spoke with Hanners on July 3, 2014, and asked him to allow the Frontier League to finish the lease negotiations. Hanners stated that he was agreeable but would first have to talk with his people—Zimmerman ([Filing No. 58-1 at 18](#)). Ysursa confirmed this conversation in a letter dated July 4, 2014 ([Filing No. 203-54](#)). On July 7, 2014, the executive committee met to discuss a course of action that assumed Hanners would comply with the Frontier League's directives and turn over the Kokomo negotiations to the Frontier League. However, Hanners communicated to Ysursa his plan to be in Kokomo to finalize the negotiations ([Filing No. 224-9 at 1](#); [Filing No. 58-1 at 19](#)).

On July 8, 2014, Ysursa sent another letter to Hanners in an effort to resolve the situation with Kokomo and Hanners' involvement there. Ysursa explained that the expansion opportunity was always a Frontier League opportunity, and the Frontier League should be permitted to finalize the lease and team membership with Kokomo ([Filing No. 203-55](#)).

Also on July 8, 2014, McKay sent a text message to Commissioner Lee stating that Kokomo had reached an agreement on the lease with Hanners' group, which would bring a team to Kokomo. McKay indicated that there was no guarantee it would be a Frontier League team, but Kokomo hoped that it would be (Filing No. 203-67; Filing No. 203-74 at 21; Filing No. 224-3). By letter dated July 9, 2014, Ysursa informed Hanners that if he failed to conform to the directives of the Frontier League and the bylaws and his duties, he would be in breach of his fiduciary duties, and "the Frontier League will take all legal and administrative actions it deems appropriate to protect its members and interests." (Filing No. 203-67 at 2; Filing No. 203-74 at 21.)

On July 11, 2014, Mayor Goodnight emailed Commissioner Lee to inform him that Kokomo was working with Zimmerman and his group (Filing No. 203-4 at 2; Filing No. 224-12). MKE Baseball LLC, one of Zimmerman's entities, executed a lease with Kokomo for the baseball opportunity in Kokomo. The lease was assignable by MKE Baseball to any limited liability company in which Hanners or Zimmerman was a majority owner and expressly included the Rock River Valley Club (Filing No. 224-17). After securing the lease with Kokomo, Hanners and Zimmerman presented several different proposals to the Frontier League members for Zimmerman's admission into the Frontier League and to approve a franchise in Kokomo under Hanners' and Zimmerman's control (Filing No. 204-1; Filing No. 75 at 13; Filing No. 119 at 7).

Zimmerman offered to sell an interest in the Kokomo opportunity to the members of the Frontier League, while at the same time acknowledging that the Frontier League had always viewed Kokomo as a Frontier League opportunity (Filing No. 75 at 13–14; Filing No. 119 at 7). Regarding the value of a Kokomo team, Zimmerman informed the Frontier League directors that "we estimate the fair market value of the Kokomo baseball team to be $1,000,000." (Filing No.

204-1 at 6.)  The Frontier League denied the Zimmerman Defendants' expansion application to join the Frontier League on August 7, 2014 (Filing No. 203-24).

In September 2014, Zimmerman announced that he was bringing a team from the Prospect League, a competitor of the Frontier League, to Kokomo to play at the stadium covered by the Kokomo lease (Filing No. 75 at 14; Filing No. 119 at 7; Filing No. 203-46 at 6).  At the end of September 2014, Wickline resigned as the director of the Rock River Valley Club, a Frontier League team, and on October 17, 2014, the Prospect League announced that Wickline had been named its commissioner (Filing No. 75 at 14; Filing No. 78 at 10; Filing No. 118 at 9).

The Plaintiffs allege that, because the Frontier League did not secure the Kokomo expansion opportunity, "the League members, and therefore the League itself, incurred the significant costs associated with funding the travel team[, and] . . . the League and its members lost the fair market value of the Kokomo opportunity . . . [and] the $50,000 expansion fee." (Filing No. 75 at 14–15.)

Washington Club made two demands on the Frontier League to bring this derivative action on its own behalf.  The first demand was an August 20, 2014 letter to the Frontier League's executive committee, explaining the damages the Frontier League had already incurred as a result of the conduct of Hanners, Wickline, and the Zimmerman Defendants and demanding the initiation of its own legal action against the Zimmerman Defendants. The demand requested that the executive committee convene to discuss the demand (Filing No. 203-31 at 4–5).  Washington Club made a second demand sixteen days later through a letter dated September 5, 2014.  This second letter addressed additional damages to the Frontier League resulting from Kokomo's and Zimmerman's announcement that a Prospect League team would be based in Kokomo. Washington Club demanded that the Frontier League consider taking its own action against the

Zimmerman Defendants and at least have the executive committee meet as a precursor to further action.

Approximately three months before initiating this lawsuit, Washington Club filed an internal administrative complaint with the Frontier League against Rock River Valley Club, Hanners, and Wickline on August 27, 2014 (Filing No. 203-52 at 2). The internal complaint was handled by Commissioner Lee pursuant to the Frontier League's by-laws. Commissioner Lee conducted an eight-month investigation, which resulted in a 44-page decision against Rock River Valley Club and an assessment of a fine (Filing No. 203-1 at 2; Filing No. 58-1).

On November 14, 2014, Washington Club and Williams filed this lawsuit before the Frontier League provided a response to the derivative suit demands. The initial complaint alleged claims for civil conspiracy to breach fiduciary duties, tortious interference with a business relationship, and unjust enrichment against the Zimmerman Defendants (Filing No. 1). On January 13, 2015, the Zimmerman Defendants filed a motion to dismiss, and on January 26, 2015, the Frontier League filed a motion to dismiss.

On February 3, 2015, the Frontier League issued a report from its special litigation committee ("SLC"). The report stated that the SLC considered, addressed, and rejected Washington Club's demands (Filing No. 203-15). Soon thereafter, on February 6, 2015, Washington Club and Williams filed their first Amended Complaint to address the alleged deficiencies raised in the motions to dismiss (Filing No. 36). On February 20, 2015, the Zimmerman Defendants and the Frontier League filed their second round of motions to dismiss. Because of the filing of the first amended complaint and a second round of motions to dismiss, the Court denied as moot the Defendants' first round of motions to dismiss.

On November 18, 2015, the Court granted the Defendants' second round of motions to dismiss, dismissing with prejudice the claim for tortious interference with a business relationship and granting leave to amend the complaint for the claims of civil conspiracy to breach fiduciary duties and unjust enrichment ([Filing No. 73 at 21](#)). On December 2, 2015, Washington Club and Williams filed their Second Amended Complaint, asserting claims for breach of fiduciary duty and civil conspiracy to breach fiduciary duties against the Zimmerman Defendants, Schaub, Hanners, and Wickline ([Filing No. 75](#)).

On December 16, 2015, the Zimmerman Defendants filed another Motion to Dismiss ([Filing No. 80](#)), and Schaub filed his Motion to Dismiss on January 6, 2016 ([Filing No. 95](#)). Hanners and Wickline filed their Motion to Dismiss on February 3, 2016 ([Filing No. 103](#)). On September 14, 2016, the Court granted in part and denied in part the Zimmerman Defendants' Motion, granted Schaub's Motion, and denied Hanners' and Wickline's Motion. The Court's Order dismissed Schaub as a defendant. The Order left for further adjudication the claim for civil conspiracy to breach fiduciary duties against the Zimmerman Defendants and the claim for breach of fiduciary duties against Hanners and Wickline ([Filing No. 116 at 23](#)–24). Williams and Washington Club are pursuing these claims on behalf of themselves and derivatively for the Frontier League.

On June 3, 2017, the Frontier League filed its Motion for Summary Judgment, asking the Court to dismiss the derivative claims ([Filing No. 176](#)). On August 29, 2017, the Zimmerman Defendants asked the Court for permission to join in the Frontier League's Motion for Summary Judgment ([Filing No. 201](#)), and on September 19, 2017, they filed their own separate Motion for Summary Judgment ([Filing No. 213](#)). On December 20, 2017, the Court granted the Zimmerman Defendants' Motion to join in the Frontier League's Motion for Summary Judgment and set the

motion for oral argument for a hearing ([Filing No. 232](#)).  Oral argument was held on the Frontier League's Motion for Summary Judgment on January 16, 2018.

## II.     SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 106 S.Ct. 1348 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.  DISCUSSION

The Frontier League moves for summary judgment on the Plaintiffs' derivative claims for breach of fiduciary duty and civil conspiracy to breach fiduciary duty. The Zimmerman Defendants move for summary judgment on the claim for civil conspiracy to breach fiduciary duty brought against them. The Court will address each motion in turn.

### A.    The Frontier League's Motion for Summary Judgment

The Frontier League advances two arguments in its Motion for Summary Judgment.  First, it argues that the derivative claims should be dismissed based on the "business judgment rule," which creates a rebuttable presumption to uphold the decision of the Frontier League's special litigation committee ("SLC") to not pursue the claims in this action.  Second, it argues the claim against the Zimmerman Defendants for civil conspiracy to breach fiduciary duties should be dismissed because such a claim is not recognized under Ohio law.  The Frontier League argues that any underlying facts regarding the Zimmerman Defendants' conduct, Washington Club's conduct, or any other members' conduct are not material to the legal issues that entitle it to summary judgment.

The Frontier League asserts that the "internal affairs doctrine" compels the Court to apply Ohio law to the substantive issues in this case because the Frontier League is an Ohio corporation. The Frontier League points to *Abrams v. McGuireWoods LLP*, 518 B.R. 491, 499 (N.D. Ind. 2014),

wherein the Northern District of Indiana court explained, "In cases involving the internal affairs of a corporation or LLC, Indiana applies the 'internal affairs doctrine' to determine what state's law applies to the claim," and the "internal affairs doctrine provides that the law of the state in which a company is incorporated or organized governs its internal affairs." *Id.*

Under Ohio law, the Frontier League asserts that it should be granted summary judgment on both derivative claims because of Ohio's business judgment rule. In February 2015, the Frontier League issued a report from its SLC which stated it considered, addressed, and rejected the Plaintiffs' demands concerning this litigation (Filing No. 203-15). The SLC concluded that pursuing this litigation was not in the best interests of the Frontier League. In reaching this conclusion, the Frontier League asserts that its SLC even assumed the facts alleged by the Plaintiffs to be true. Furthermore, the SLC met to discuss the ongoing litigation on May 22, 2017, and issued a supplemental report, again concluding that this litigation is not in the best interests of the Frontier League (Filing No. 177-2 at 3; Filing No. 203-33).

The Frontier League argues that under Ohio's business judgment rule, "[t]he burden is on the party challenging the decision to establish facts rebutting the presumption of good faith of directors invoked by the business judgment rule." *Koos v. Cent. Ohio Cellular*, 641 N.E.2d 265, 273 (Ohio Ct. App. 1994) (citation and quotation marks omitted). Under Ohio law, the business judgment rule applies to an SLC's determination "whether to pursue or terminate a derivative suit filed on behalf of the nonprofit corporation." *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1343 (Ohio Ct. App. 1990). Courts will defer to the judgment of an SLC if: (1) the litigation committee is comprised of independent, disinterested members; (2) the litigation committee conducts its inquiry in good faith; and (3) the litigation committee's recommendation is the product of a thorough investigation. *Id.* The Frontier League asserts that the Plaintiffs have no evidence to rebut the

presumption of good faith, independence, and a thorough investigation, and thus, the business judgment rule should be applied to uphold the Frontier League's SLC's decision not to pursue this litigation, and the Court should dismiss this action.

Next, the Frontier League argues that the claim against the Zimmerman Defendants for civil conspiracy to breach fiduciary duties should be dismissed because this claim is not recognized under Ohio law. It asserts that Ohio law applies based on the internal affairs doctrine because the Frontier League is an Ohio corporation and the basis of a claim for civil conspiracy or aiding and abetting the breach of fiduciary duty is the Restatement (Second) of Torts § 876. The Ohio Supreme Court unequivocally stated that Ohio law does not recognize claims under Restatement (Second) of Torts § 876. *DeVries Dairy, L.L.C. v. White Eagle Coop. Ass'n*, 974 N.E.2d 1194, 1194 (Ohio 2012). The Frontier League asserts that this is a pure legal question that cannot be affected by any factual disputes, and the Ohio Supreme Court has clearly stated that a claim for civil conspiracy to breach fiduciary duties is not legally recognized. Thus, the Frontier League argues, the Plaintiffs' claim must be dismissed on this independent, additional basis.

In response to the Frontier League's Motion for Summary Judgment, the Plaintiffs agree with the Frontier League that Ohio law does not recognize a claim for civil conspiracy (or aiding and abetting) to breach fiduciary duties. However, the Plaintiffs argue that Ohio law does not apply because the claim against the Zimmerman Defendants does not involve an "internal affair" of the Frontier League (involving its officers, directors, or investors), and thus, the internal affairs doctrine does not apply. Rather, the claim is against third-parties who were not part of the Frontier League, and thus, their tortious actions do not concern internal affairs. Because the claim is for a tort that occurred in Indiana, the Plaintiffs assert that Indiana law applies in this diversity jurisdiction case.

Plaintiffs note that the Zimmerman Defendants and Defendants Hanners and Wickline have argued to this Court that Indiana law applies to the civil conspiracy claim, and the Court already has applied Indiana law to the claim while considering the motions to dismiss. Thus, they argue, it is the law of the case that Indiana law applies to the civil conspiracy claim, and the Frontier League should not be allowed to now assert that Ohio law applies.[2] The Plaintiffs note that Indiana has expressly adopted to allow claims for aiding and abetting in intentional torts and negligence. *See Pinkney v. Thomas*, 583 F. Supp. 2d 970, 978–79 (N.D. Ind. 2008). Therefore, under Indiana law, Plaintiffs argue their claim for civil conspiracy to breach fiduciary duties against the Zimmerman Defendants is a viable claim.

Concerning the business judgment rule and the viability of both derivative claims, the Plaintiffs assert that none of the three requirements necessary to apply the rule are satisfied in this case, and thus, the Court should not defer to the Frontier League's SLC's business judgment. The Plaintiffs argue that the Frontier League has provided only bald assertions that the SLC was comprised of independent, disinterested members, conducted its inquiry in good faith, and conducted a thorough investigation. The Plaintiffs assert that the Frontier League designated only an affidavit from its in-house counsel, and then it hid behind the attorney-client privilege to hinder a full disclosure of the facts, which show the business judgment rule is not satisfied or applicable.

The Plaintiffs designate various evidence to support their argument that the business judgment rule does not apply: deposition testimony from members of the Frontier League's SLC, deposition testimony from members of the board of directors of the Frontier League, deposition testimony from Commissioner Lee, deposition testimony from the Frontier League's in-house

---

[2] Indeed, the Zimmerman Defendants argued for application of Indiana law in their motions to dismiss (Filing No. 81 at 5; Filing No. 40 at 8), and Defendants Hanners and Wickline argued for application of Indiana law in their motion to dismiss (Filing No. 104 at 6). Additionally, the Court applied Indiana law to the civil conspiracy claim in the Orders on the motions to dismiss (Filing No. 73 at 16–18; Filing No. 116 at 17).

counsel, deposition testimony from Defendant Zimmerman, email exchanges, meeting minutes, a proposed settlement agreement, and other documents (*see gene*rally [Filing No. 203](); [Filing No. 204](); [Filing No. 218]()).  The Plaintiffs assert that their designated evidence shows that the SLC did not conduct a thorough investigation (or any investigation at all), did not act in good faith, and was not comprised of independent, disinterested members.  Because each of the elements is not met to apply the business judgment rule, the Plaintiffs assert, the Court should not defer to the SLC's decision to avoid litigation, and the Court should allow the claims to proceed to trial.

Regarding a failure to thoroughly investigate, the Plaintiffs point out that they made two demands on the Frontier League, but the executive committee did not act.  The Plaintiffs then filed this lawsuit, and one month later, the Frontier League created its SLC by designating its executive committee as the SLC, consisting of Brown, Malliet, Nick Semaca ("Semaca"), Leslye Wuerfel, and Rich Sauget.  Each of these SLC members was a director or officer associated with a member team of the Frontier League.

The Plaintiffs assert that the SLC members had a predetermined resolve to terminate this litigation as quickly as possible without reviewing the facts or the legal issues, and without fully understanding the nature and amount of damages.  Brown clearly indicated an aversion to litigation and wanted to avoid it entirely ([Filing No. 203-25 at 1]()–2).  The SLC and its counsel discussed how to dispose of this case as quickly as possible.  Even before the SLC was established, the SLC members stated they wanted no part of this litigation, and they decided to hire a "litigation strategist" and gave him "marching orders to end this mess as quickly as possible."  ([Filing No. 203-38 at 2]()–3.)

The SLC met on December 19, 2014, but only discussed and voted on declining Williams' offer to pay for an attorney for the derivative suit, retaining Kevin Murphy as outside counsel to

represent the Frontier League, and determining the goal of engaging the parties to negotiate a resolution as quickly and efficiently as possible (Filing No. 203-39).

The Plaintiffs assert that the meeting minutes from the SLC's few meetings show that there were no meaningful discussions about the merits of the litigation and no investigation into the claims. Rather, they argue, the minutes show that the members of the SLC wanted to quickly get rid of the litigation without concerning themselves with learning the facts.

On January 15, 2015, the executive committee met and had limited discussion about the derivative suit (Filing No. 203-63). The Plaintiffs point out that Rich Sauget admitted there was always a desire to know more about the facts surrounding the lawsuit (Filing No. 203-9 at 12), but no real investigation occurred. The SLC did not interview any witnesses, instruct its counsel to interview any witnesses, review documents, attempt to value the Kokomo opportunity, or engage an expert to value the opportunity (Filing No. 203-7 at 42, 47; Filing No. 203-11 at 9). Four days later, on January 19, 2015, the SLC met and voted to direct its attorneys to seek dismissal of this lawsuit (Filing No. 203-64).

The Plaintiffs argue that, on January 26, 2015, the Frontier League filed its Motion to Dismiss and asserted that it had investigated the claims. A week later, the Frontier League submitted its first SLC report to the Court in support of its Motion to Dismiss (Filing No. 35-1). The report noted it was issued after consideration of all material facts. Brown verified the report by signing a sworn statement attesting to its truthfulness, yet Brown could not recall any investigation undertaken by the SLC before the report was issued (Filing No. 203-7 at 43). Other members of the SLC could not recall ever seeing the SLC's report before it was verified and submitted to the Court (Filing No. 203-9 at 12; Filing No. 203-11 at 9–10).

Some SLC members were aware that some Frontier League members were trying to work with Zimmerman, but they did not conduct any investigation into this. Brown testified that he did not know specifically who was trying to work with Zimmerman, and he testified that he did not want to know who (Filing No. 203-7 at 14, 21).

The Plaintiffs assert that the SLC did not investigate the value of the claims, but rather, the SLC simply assumed the claims were valued at $50,000.00 based on the legacy option that they assumed would have been available in Kokomo (Filing No. 203-9 at 17; Filing No. 203-13 at 18). The Plaintiffs compare Commissioner Lee's eight-month investigation that resulted in a 44-page report to the SLC's failure to interview witnesses, obtain documents, or review documents. This comparison, the Plaintiffs assert, highlights the SLC's lack of a thorough investigation. The SLC members were aware of Commissioner Lee's investigation and said that they were going to rely on his findings because he was conducting an investigation. In December 2014, the SLC members knew that Ysursa had Commissioner Lee's draft report and that Ysursa was reviewing 1,500 pages of supporting documents (Filing No. 203-61 at 2). The Plaintiffs point out that the SLC did not even wait to receive and review Commissioner Lee's report dated April 23, 2015, before the SLC issued its short statement in February 2015, declaring that it did not believe this litigation was in the best interest of the Frontier League.

Commissioner Lee's internal investigation resulted in finding Rock River Valley Club in violation of the by-laws and fining the club $100,000.00. The Plaintiffs point out that Commissioner Lee's findings and the Frontier League's fine against Rock River Valley Club did not change the SLC's view of the litigation or its view about the value of the claims. The SLC did not reconvene to review Commissioner Lee's decision or update the SLC's report (Filing No. 203-50 at 5).

Regarding the element of "good faith" to support application of the business judgment rule, the Plaintiffs argue that the Frontier League's misrepresentations to the Court about conducting a thorough investigation when it had not conducted any investigation show a lack of good faith. They also argue that the SLC blindly rejected the settlement agreement reached between the Plaintiffs and Hanners and Wickline. The SLC never saw, evaluated, or discussed the settlement agreement. The Plaintiffs assert this blind rejection of a settlement agreement that would have benefited the Frontier League is further evidence of a lack of good faith.

The Plaintiffs further argue that a lack of good faith is exhibited by the issuance of the May 2017 SLC report wherein it stated the Frontier League opposed the claim against the Zimmerman Defendants because it was not a viable claim under Ohio law, yet this claim would be to the benefit of the Frontier League. Without the claim against the Zimmerman Defendants, the only claim remaining would be against Hanners and Wickline, who have limited resources. The May 2017 report notes that the SLC determined in light of Ohio law that the claim against the Zimmerman Defendants was not in the Frontier League's best interest. Yet, members of the SLC could not recall ever seeing the May 2017 report or talking about it in a meeting (Filing No. 203-7 at 35; Filing No. 203-9 at 28).

The Plaintiffs argue that the statement in Ysursa's affidavit that the SLC assumed all facts to be true as asserted in the Plaintiffs' complaint is revisionary and contradicts the statement in the February 2015 SLC report that the SLC was charged with investigating the matter, and it considered all material facts when issuing its report. The Plaintiffs assert that this new contradiction evidences a lack of good faith on the part of the Frontier League. And lastly, the Plaintiffs argue that bad faith is shown by the Frontier League's recently proposed changes to its by-laws to eliminate fiduciary duties owed to fellow members, to eliminate a right to bring

derivative suits, and to allow a sanction of expulsion from the Frontier League for bringing a derivative action ([Filing No. 204-3](#)).

Finally, concerning the business judgment rule's element of independence of SLC members, the Plaintiffs argue the evidence shows not all the members of the SLC were truly independent without self-interests. The Plaintiffs argue that their evidence shows some of the members of the SLC, especially Brown, had been involved to some degree in the Zimmerman Defendants' tortious conduct or had previous business dealings with Zimmerman, but they failed to disclose their involvement to the other members of the SLC or the Frontier League's board ([Filing No. 203-20](#); [Filing No. 203-22 at 2](#); [Filing No. 203-23](#); [Filing No. 203-68](#); [Filing No. 203-3](#); [Filing No. 203-28](#)). Semaca and Schaub had business dealings with Zimmerman, making Semaca not entirely independent while sitting on the SLC ([Filing No. 203-44](#); [Filing No. 203-51](#)).

In sum, the Plaintiffs argue that their evidence shows the three elements of the business judgment rule are not satisfied, so the Court should not defer to the Frontier League's decision not to pursue this litigation. They argue Indiana law applies to the civil conspiracy claim against the Zimmerman Defendants, and it is a viable claim under Indiana law. Therefore, they assert that their claims should survive summary judgment and proceed to trial.

The Frontier League replies that the arguments and facts asserted by the Plaintiffs are merely immaterial distractions that do not preclude summary judgment in its favor. It asserts that the presumption of good faith, thorough investigation, and independence of the SLC has not been overcome, and thus, the SLC's recommendation to not pursue this litigation should be honored, and the Court should dismiss the derivative claims.

The Frontier League explains that it assumed the facts asserted by the Plaintiffs to be true, thereby satisfying the need for a thorough investigation. Because the Plaintiffs filed this lawsuit

before the SLC was formed, the SLC had all the facts before them. The Frontier League notes that the SLC considered any potential damages and determined that any damages would belong to other entities and not the Frontier League itself, and therefore, it determined litigation was not warranted. It also argues that "putting a lawsuit in the rearview mirror" and having an aversion to litigation are legitimate reasons for the SLC's conclusion not to pursue the derivative claims. In addition, the Frontier League's asserts that its opposition to the Hanners and Wickline settlement agreement was not an indication of bad faith but rather was the result of missing information about the agreement and whether the agreement really benefited the Plaintiffs instead of the Frontier League. It reiterates its position that Ohio law applies to the derivative claims, and the claim against the Zimmerman Defendants is not a viable claim under Ohio law.

The Court first addresses the choice of law issue as it pertains to the civil conspiracy claim against the Zimmerman Defendants. The Frontier League asserts that Ohio law applies under the internal affairs doctrine. The Plaintiffs counter that Indiana law applies under choice of law principles concerning tort claims in federal court with diversity jurisdiction. The Court determines that Indiana law applies to the claim for civil conspiracy to breach fiduciary duties against the Zimmerman Defendants. This determination is made based on case law, including *Abrams*, 518 B.R. 491 ("In cases involving the internal affairs of a corporation or LLC, Indiana applies the 'internal affairs doctrine' to determine what state's law applies to the claim," and the "internal affairs doctrine provides that the law of the state in which a company is incorporated or organized governs its internal affairs.") as well as *Foodcomm Int'l v. Barry*, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006) ("the 'internal affairs doctrine' is only applicable 'when the subject is liability of officers and directors *for their stewardship of the corporation*, the law presumptively applicable is the law of the place of incorporation.'"); *Chapel Ridge Invs, L.L.C. v. Petland Leaseholding Co.*, 2013

U.S. Dist. LEXIS 171345 (N.D. Ind. Dec. 4, 2013). Moreover, the Defendants previously argued for application of Indiana law and the Court previously applied Indiana law to this claim.

The Frontier League has also asserted that the claim for civil conspiracy to breach fiduciary duties against the Zimmerman Defendants should be dismissed because Ohio law does not recognize such a claim as held in *DeVries Dairy*, 974 N.E.2d 1194. The Frontier League did not address any evidence or the elements of such a claim under Indiana law. It simply made the legal argument that the claim is not viable under Ohio law. In light of the Court's determination that Indiana law applies to this claim, and because the Court previously has determined that such a claim is recognized under Indiana law (see Filing No. 73 at 16–18; Filing No. 116 at 17), the Court concludes the Frontier League's argument regarding the civil conspiracy claim does not warrant summary judgment.

Turning to the business judgment rule, the Court concludes that deference to the business judgment of the SLC is not warranted in this case at the summary judgment stage. The evidence designated by the Plaintiffs and cited and discussed above shows that there are serious doubts about the independence of the SLC members and about a thorough investigation being conducted.

Brown and Semaca each had business dealings with Zimmerman that were not disclosed to the Frontier League directors or the other SLC members. Some of those business dealings were directly related to the subject matter of this litigation. The evidence suggests that the SLC members predetermined not to pursue the claims and to quickly end the litigation without fully investigating the facts and determining the value of the claims. Some SLC members explained that they were going to rely on Commissioner Lee's investigation and report in place of their own investigation, yet the SLC issued its litigation report and filed it with the Court before Commissioner Lee's report was even finalized.

Because some of the members of the SLC were not independent and because a thorough investigation was not performed by the SLC before issuing its litigation reports, the Court determines that the SLC's business decision to not pursue this litigation is not entitled to deference. As pointed out by the Plaintiffs, "Courts considering a derivative action will not defer to a special litigation committee whose investigation lacked the thoroughness which is necessary for a truly objective and meaningful recommendation and no deference is due to the extent that the SLC does not investigate and analyze a claim." 19 Am. Jur. 2d Corporations § 1966. The lack of independence and thorough investigation undermined the integrity of the SLC process and defeated the very purpose for giving an SLC deference. Therefore, the Court concludes that summary judgment is not warranted pursuant to the business judgment rule.

For the foregoing reasons, the Court **denies** the Frontier League's Motion for Summary Judgment (Filing No. 176), and the derivative claims may proceed to trial.

**B.**     **The Zimmerman Defendants' Motion for Summary Judgment**

The Zimmerman Defendants argue that they are entitled to summary judgment on the claim for civil conspiracy to breach fiduciary duties because Ohio law does not recognize such a claim and because the business judgment rule provides additional protection under the Frontier League's SLC's decision to not pursue the claim. These arguments were considered, addressed, and resolved above when the Court resolved the Frontier League's Motion for Summary Judgment. These arguments do not warrant summary judgment in this case.

The Zimmerman Defendants assert that a "claim of a breach of fiduciary duty is basically a claim of negligence, albeit involving a higher standard of care." *Strock v. Pressnell*, 527 N.E.2d 1235, 1243 (Ohio 1988). The essential elements of a claim of breach of fiduciary duty are (1) the existence of a duty arising from a fiduciary relationship, (2) the failure to observe the duty, and (3)

an injury resulting proximately therefrom. *Puhl v. U.S. Bank, N.A.*, 34 N.E.3d 530, 536 (Ohio Ct. App. 2015).

A claim for civil conspiracy to breach fiduciary duties requires that the fiduciary breach its duty, that the third-party, non-fiduciary knowingly and substantially assist in the breach, and that the third-party, non-fiduciary be aware of its role when providing the assistance. *Fifth Third Bank v. Double Tree Lake Estates, LLC*, 2014 U.S. Dist. LEXIS 99758, at *34 (N.D. Ind. July 23, 2014) (citing *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006); Restatement (Second) of Torts § 876).

The Zimmerman Defendants assert that there is no evidence of an underlying breach of fiduciary duties by Hanners and Wickline because the by-laws of the Frontier League allowed them to pursue a second membership in the Frontier League. Their pursuit of a second membership, with a team in Kokomo, was expressly permitted by the by-laws and could be accomplished by the $50,000.00 "legacy option". Additionally, Hanners and Wickline openly talked about their interest in pursuing the Kokomo opportunity, and thus, that interest was not undisclosed to the Frontier League and the other members.

The Zimmerman Defendants further assert that the facts show the Frontier League was aware of Zimmerman's involvement in Kokomo and with Hanners and Wickline and also that Commissioner Lee actually provided information to Zimmerman about the Kokomo opportunity and other Frontier League opportunities. They explain that the Frontier League sent documents relating to the Kokomo opportunity to Hanners. Once Kokomo indicated that it was going to work with Hanners and Zimmerman, the Frontier League withdrew from any additional involvement in Kokomo.

The Zimmerman Defendants argue that the Plaintiffs cannot support the element of damages. They assert that the Plaintiffs base their damages on the expiration of the $50,000.00 "legacy option" and the costs of paying for a travel team. The Zimmerman Defendants assert that the legacy option in the by-laws was created by the members of the Frontier League, and while that option expired by its own terms, the members are free at any time to reenact a similar legacy option. Thus, damages cannot reasonably arise out of the expiration of the legacy option. Additionally, the Zimmerman Defendants argue, damages cannot reasonably arise out of the Frontier League's ongoing costs of paying for a travel team because the Zimmerman Defendants applied to become a member and add a team to the Frontier League, which would have eliminated the need for a travel team. However, the Frontier League rejected their application, so the ongoing need for a travel team was a problem of the Frontier League's own making.

The Zimmerman Defendants point to this Court's earlier Order on Motions to Dismiss and assert that the facts of this case do not support a conspiracy claim.

> This claim would require that the fiduciary breach its duty, that the third-party, non-fiduciary knowingly and substantially assist in the breach, and that the third-party, non-fiduciary be aware of its role when providing the assistance. *Fifth Third Bank v. Double Tree Lake Estates, LLC*, 2014 U.S. Dist. LEXIS 99758, at *34 (N.D. Ind. July 23, 2014). Further, "such a tort [would] require that the nonfiduciary act knowingly or intentionally when joining the fiduciary in an enterprise constituting a breach of fiduciary duty." *Crystal Valley Sales, Inc.*, 22 N.E.3d at 656.

(Filing No. 73 at 17.) The Zimmerman Defendants argue that no conspiracy can be shown because of the following facts:

> - Zimmerman was made aware of Kokomo, by the League, as early as March, 2014, and shortly after the opportunity became known;
>
> - when Brown withdrew from Kokomo, the opportunity was discussed with Zimmerman, in person, in Milwaukee, by the Commissioner, at which time Zimmerman expressed an interest in pursuing;

- before going to Kokomo, Zimmerman called the Commissioner, asking if there was anything stopping him from pursuing it -- the Commissioner said no;

- the Frontier League withdrew from Kokomo when the City chose to work with Zimmerman;

- at least one, perhaps more invitations to join in Kokomo was extended to other Frontier League members;

- after Zimmerman submitted an application, it was vetted, modified, and reviewed by the full board at a price higher than the "legacy option"; and

- the full board voted against the application.

([Filing No. 214 at 23](#)–24).  Based on these facts, the Zimmerman Defendants assert that they are entitled to summary judgment on the claim alleged against them.

The Plaintiffs respond by arguing the designated evidence establishes a dispute about the breach of fiduciary duties committed by Hanners and Wickline as well as Zimmerman's involvement and conspiracy in that breach.  The Plaintiffs also argue that the damages they assert are not speculative, and they arise out of the lost Kokomo opportunity.  The Plaintiffs point to various emails and letters wherein Ysursa and Tahsler repeatedly explained to Hanners and the other directors that the Kokomo opportunity was a Frontier League opportunity to be made available to all members.  While the by-laws permitted members to pursue a second membership, the Kokomo opportunity was a Frontier League opportunity.  The Plaintiffs also point to conversations among Commissioner Lee, Hanners, and Zimmerman, during which Commissioner Lee explained that Williams was working on negotiations with Kokomo, and Hanners and Zimmerman should first talk with Williams.

The Plaintiffs emphasize that Ysursa sent a series of letters to Hanners—after the Frontier League was informed that Hanners and Zimmerman had been in Kokomo—directing him that the Kokomo opportunity was an opportunity for the Frontier League, and if he proceeded with

Kokomo, he would be breaching his fiduciary duties. The Plaintiffs dispute the inferences the Zimmerman Defendants assert that Commissioner Lee authorized them to pursue the Kokomo opportunity for themselves; rather, the opportunity was always a Frontier League opportunity.

The Plaintiffs also point to an affidavit from Hanners, wherein he averred that he received the letters from Ysursa directing him to stand down because of his fiduciary duties. Hanners explained that he wanted to stand down, but Zimmerman was directing the negotiations with Kokomo and the responses to the Frontier League, and Zimmerman wanted to move forward with Kokomo. Hanners further explained that he and Zimmerman were working together as partners in their efforts. The Plaintiffs assert that Zimmerman pursued his partnership with Hanners and then actively pushed Hanners into breaching his fiduciary duties (Filing No. 203-75 at 3–5). These actions support the elements of their claim for both the Hanners breach and the Zimmerman/ Hanners conspiracy.

The Plaintiffs assert that the Zimmerman Defendants' application to join the Frontier League and their various proposals to involve the Frontier League in Kokomo were not made in good faith. The Kokomo opportunity was viewed by the Frontier League as its exclusive opportunity without an up-front cost, but after the Zimmerman Defendants and Hanners took the opportunity, the Frontier League got nothing and would have to pay Zimmerman to buy into the opportunity. Additionally the lost opportunity to have a Frontier League team in Kokomo has led to significant damage, not only in the expansion fee of a new member whether under the "legacy option" or otherwise but also in the ongoing expense of funding the travel team and an opportunity in Kokomo that Zimmerman himself valued at one million dollars. The Plaintiffs assert that these costs and lost opportunities are based on facts supported by the documents in evidence (noted in the background section above), not by mere speculation. They argue the Zimmerman Defendants

are wrong in asserting that there are no damages because the Frontier League rejected their application to enter the Frontier League. That the Frontier League did not want to allow the Zimmerman Defendants to benefit from their wrongful conduct at the expense of the Frontier League does not mean that no damages were suffered.

The Plaintiffs adamantly maintain that the Kokomo opportunity was a Frontier League opportunity, and Hanners' personal pursuit of the opportunity with Zimmerman's help was a breach of fiduciary duties. On the other hand, the Zimmerman Defendants steadfastly insist that the Frontier League invited them to pursue the Kokomo opportunity with Hanners personally, without concern for fiduciary duties. Each parties' position finds some support in the designated evidence. Summary judgment proceedings are not the mechanism by which factual disputes are weighed and resolved. Because there is some evidence to support the parties' competing positions and the evidence gives rise to factual disputes, the Court determines that summary judgment is not appropriate on the claim against the Zimmerman Defendants.

The Plaintiffs have designated sufficient evidence at the summary judgment stage to support their claim for civil conspiracy to breach fiduciary duties against the Zimmerman Defendants. This evidence includes various communications among Zimmerman, Hanners, Wickline, Schaub, and the Kokomo officials (Filing No. 203-69; Filing No. 203-70; Filing No. 203-72); Zimmerman's July 2, 2014 email to Ysursa (Filing No. 58-1 at 17); Ysursa's letters and telephone calls with Hanners (Filing No. 203-53 at 2–3; Filing No. 203-54; Filing No. 58-1 at 18–19; Filing No. 224-9 at 1; Filing No. 203-55; Filing No. 203-67 at 2); and Hanners' affidavit (Filing No. 203-75).

As the Seventh Circuit has aptly observed, "Certainly, the evidence is of varying strength against [the] defendant, but at this stage we do not weigh the proof, make credibility

determinations, or resolve narrative disputes. Those tasks are left for the trier of fact." *Ortiz v. City of Chi.*, 656 F.3d 523, 534 (7th Cir. 2011); *see also United States v. Funds in the Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730 F.3d 711, 717 (7th Cir. 2013) ("[W]eigh[ing] the strength of the evidence or mak[ing] credibility determinations [are] tasks belonging to the trier of fact. At summary judgment, whether the movant's evidence is more persuasive than the evidence of the non-movant is irrelevant. The only question is whether the evidence presented, reasonably construed in the light most favorable to the non-movant, creates a genuine dispute regarding any material fact precluding judgment as a matter of law.") (Citations omitted).

## IV.  CONCLUSION

For the reasons discussed above, the Frontier League's Motion for Summary Judgment (Filing No. 176) is **DENIED**, and the Zimmerman Defendants' Motion for Summary Judgment (Filing No. 213) also is **DENIED**.  The Plaintiffs' claims may proceed to trial.

**SO ORDERED.**

Date:  5/29/2018

_____

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jay Jaffe
FAEGRE BAKER DANIELS LLP
jay.jaffe@FaegreBD.com

Sarah Elizabeth Sharp
FAEGRE BAKER DANIELS LLP
sarah.sharp@faegrebd.com

Bernie W. (Too) Keller
KELLER MACALUSO LLC
too@kellermacaluso.com

Joseph Jeffrey Landen
MURPHY LANDEN JONES PLLC
jlanden@mljfirm.com

Kevin L. Murphy
KEVIN L. MURPHY PLLC
KMurphy@MLJfirm.com

Jacques C. Condon
CONDON LAW FIRM LLC
jacques@condon-law.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

Mark Wohlford
BOSE MCKINNEY & EVANS, LLP
mwohlford@boselaw.com

Philip R. Zimmerly
BOSE MCKINNEY & EVANS, LLP
pzimmerly@boselaw.com

Eric J. Neidlinger
KELLER MACALUSCO LLC
eneidlinger@kellermacaluso.com

Linda L. Pence
SMITH AMUNDSEN LLC
lpence@salawus.com