UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WASHINGTON FRONTIER LEAGUE BASEBALL, LLC, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CASE NO.  1:14-cv-1862-TWP-DML ) |
| MICHAEL E. ZIMMERMAN, et al. | ) ) |
| Defendants, | ) ) |
| and | ) ) |
| FRONTIER PROFESSIONAL BASEBALL, INC., | ) ) |
| Nominal Defendant. | ) |

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SANCTIONS

Plaintiffs Washington Frontier League Baseball, LLC ("Washington"), on its own and derivatively on behalf of Frontier Professional Baseball, Inc. (the "League"), and Stuart A. Williams respectfully submit this Brief in Support of the Motion for Sanctions against League counsel Kevin L. Murphy ("Murphy") and J. Jeffrey Landen ("Landen").

### INTRODUCTORY STATEMENT

In staking out a "strategy" to respond to Washington's derivative claims in this case, Murphy and Landen repeated the same materially false statements over and over again in court filings and arguments: They said that the League's special litigation committee ("SLC") conducted a thorough investigation of the facts underlying the derivative claims and concluded, based on that investigation, it was not in the League's interest for those claims to go forward. But Murphy and Landen knew that these statements were not true. They knew that the SLC was not

comprised of independent members. They knew that the SLC did not conduct a thorough investigation in good faith. Murphy and Landen knew that once the SLC followed the recommendation to seek dismissal of the derivative claims, they could create a "nightmare" of delay and expense for Washington.

In pressing the Court to rely on those misrepresentations, they filed a motion to dismiss in which they said the SLC investigated the claims. A week later, they authored and filed an SLC "report" based on this purported investigation. After the plaintiffs filed an amended complaint, Murphy and Landen represented in a second motion to dismiss that the SLC had fully investigated the claims. They secured a stay of discovery premised on the SLC's vote to deny Washington's derivative demand following this (non)investigation. They opposed the settlement with Chris Hanners and Bryan Wickline by asserting their business judgment defense premised on this fictional investigation. They filed a motion for summary judgment in which they unequivocally described the Report as "the product of a thorough, independent investigation conducted in good faith."

All of those filings and representations were based on lies. The League recently provided Washington with the unredacted notes from the SLC meetings, its email communication with Murphy and Landen, and the invoices it received from Murphy and Landen. These additional materials, coupled with what Washington uncovered during discovery and presented to the Court at summary judgment, demonstrate that two experienced attorneys, Murphy and Landen, unreasonably, vexatiously, and without cause multiplied and delayed these proceedings such that the Court and Washington were forced to expend significant resources to find the truth about this investigation that never happened. In the pages that follow, Murphy's and Landen's calculated

decision to rely on this false report of an investigation is exposed through their own words and communications.

The cost to Washington and the Court of this "strategy" has been substantial in terms of time, money, and other resources. The law is intended to protect parties against this very type of abuse by attorneys, who are officers of the Court and owe the Court a duty of candor. A district court has the inherent authority to sanction anyone before it for "the fraud he perpetrate[s] on the court and the bad faith he display[s] toward both his adversary and the court throughout the course of the litigation." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991). Moreover, under 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

Although courts generally are loath to sanction attorneys, this is one of those cases in which sanctions are appropriate and necessary. In fact, giving Murphy and Landen a pass in these circumstances would send the message to all who appear before the Court that lying to the Court, when "strategic," is acceptable. The Court must hold these attorneys accountable for the direct consequences of their deceit. As set forth in this brief and the accompanying declaration, Washington is seeking a sanctions award of at least $324,037.26 in fees, costs, and expenses, subject to any additional fees and expenses associated with this motion for sanctions, every penny of which is the direct result of Murphy's and Landen's misrepresentations.

## I.   STANDARD OF REVIEW

A court has "inherent power to assess attorney's fees against counsel" in certain circumstances, one of which is when a party "has acted in bad faith, vexatiously, wantonly, or for

oppressive reasons." *Chambers*, 501 U.S. at 45, 46 (internal quotations and citations omitted); *see also Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) (district court has inherent power to impose sanctions where a person "has willfully abused the judicial process or otherwise conducted litigation in bad faith"). Harsh sanctions may be appropriate in response to an abuse of "the judicial process by seeking relief based on information that the [party] knows is false." *Id.* As stated by the Seventh Circuit, "falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system." *Secrease*, 800 F.3d at 402. "Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Id.* Moreover, "courts generally have an interest in both punishing a party's dishonesty and deterring others who might consider similar misconduct." *Id.*

Sanctions are also proper under Section 1927 "if the attorney 'has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice . . . or where a claim [is] without a plausible legal or factual basis and lacking in justification.'" *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014) (quoting *Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988)). Section 1927 sanctions are also appropriate when the attorney's conduct unjustifiably delayed the case. *Overnite Trans. Co. v. Chicago Indus. Tire Co.*, 697 F.2d 789, 794 (7th Cir. 1983).

Section 1927's purpose "is to deter frivolous litigation and abusive practices by attorneys, and to ensure that those who create unnecessary costs also bear them." *Kapco Mfg. Co. v. C & O Enters., Inc.*, 886 F.2d 1485, 1491 (7th Cir. 1989) (internal citation omitted). Indeed, "[t]he best way to control unjustified tactics in litigation is to ensure that those who create costs also bear them." *In re TCI Ltd.*, 769 F.2d 441, 446 (7th Cir. 1985) (internal citation omitted). "[W]hile

subjective bad faith is sufficient to support section 1927 sanctions, such a finding is not necessary; objective bad faith will also support a sanctions award." *Hunt v. Moore Bros., Inc.*, 861 F.3d 655, 659 (7th Cir. 2017) (internal marks and citation omitted), *cert. denied*. "Sanctions awarded under § 1927 are to be paid by the lawyer, who must 'satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.'" *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017), *cert. denied.*[1]

## II.   FACTS IN SUPPORT OF SANCTIONS

This Court is well-familiar with the facts underlying this action. Importantly, at summary judgment, the Court noted that "[t]he evidence designated by Washington and cited and discussed [in the summary judgment order] shows that there are serious doubts about the independence of the SLC members and about a thorough investigation being conducted." (ECF No. 238 at 23.) "Because some of the members of the SLC were not independent and because a thorough investigation was not performed by the SLC before issuing its litigation reports, the Court determine[d] that the SLC's business decision to not pursue this litigation [was] not entitled to deference." (*Id.* at 24.)

Washington predicted that Murphy's and Landen's redactions on SLC meeting notes concealed the fact that "the basis for the SLC's direction to counsel to seek a dismissal [was] based on the attorneys' plan to get the case dismissed, not the results of an investigation the SLC said it performed." (ECF No. 217 at 38 of 52.) Washington was correct, and the situation is even worse than it surmised. The documents recently provided to Washington by the League confirm

---

[1] The Court also has inherent authority over Murphy's and Landen's law firm, Murphy Landen Jones PLLC, even if Section 1927 does not extend that far. *See Claiborne v. Wisdom*, 414 F.3d 715, 724 (7th Cir. 2005) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)).

Washington's suspicions and the Court's "serious doubts." There was never any investigation, and Murphy and Landen advanced a business judgment position they knew was built on lies.

### A. Murphy and Landen develop a "legal strategy" to defraud Washington and this Court.

In August of 2014, Washington requested the League to take steps to recover for the damage done by the Zimmerman Defendants. Receiving no response to its request, Washington ultimately initiated this action on November 14, 2014, by filing a complaint. (ECF No. 1.) Three days later, at the urging of Clint Brown ("Brown"), the League's Executive Committee authorized Brown, who was a member of the committee, to contact Murphy, his long-time attorney and close personal friend. (Nov. 17, 2014 Executive Committee notes, attached as Exhibit 1.)

Brown, who's stated goal was to let Williams know he was not the "emperor" and who himself surreptitiously sought a partnership with Zimmerman for the Kokomo baseball opportunity (ECF No. 217 at 28-26 of 52), testified that it was his "intent," "goal," and "hope" to engage an "attorney who could get the league out of the litigation." (ECF No. 203-7 (Brown Dep. at 188:2-5, 209:6-210:3).) He spoke to Murphy and Landen on November 20, 2014, and then Murphy and Landen started working on their analysis and strategies. (Feb. 10, 2015 Graydon Head Invoice ("2/10/15 Invoice"), attached as Exhibit 2.)

On December 8, 2014, Murphy provided an engagement letter to Thomas Ysursa ("Ysursa"), the League's regular counsel, copying Landen. (Dec. 8, 2014 Letter from Kevin L. Murphy to Thomas R. Ysursa, attached as Exhibit 3.) The billing records confirm that the attorneys spent the next month working on a legal strategy, but no time overseeing or conducting an investigation. (2/10/15 Invoice, Ex. 2.)

On December 16, 2014, the League appointed its five-member Executive Committee to serve as its SLC, which was comprised of Brown, Steve Malliet, Nick Semaca, Rich Sauget, and Leslye Wuerfel. (ECF No. 203-7 (Brown Dep. at 207:5-14); ECF No. 203-34 (Ex. 44); ECF No. 203-7 (Brown Dep. at 54:1-6).) The SLC was "tasked by the Board of Directors to manage and oversee the Frontier League's involvement in this Litigation." (Dec. 22, 2014 Letter from Thomas R. Ysursa to Kevin Murphy, attached as Exhibit 4.)

The SLC initially convened on December 19 and voted to retain Murphy. (December 19, 2014 Executive Committee call notes ("12/19/14 SLC Notes"), attached as Exhibit 5.) For the next several weeks, Murphy, Landen, and Nathaniel L. Swehla ("Swehla"), an associate or junior partner working for Murphy, developed and refined their litigation strategies. (April 22, 2015 Graydon Head Invoice ("4/22/15 Invoice"), attached as Exhibit 6.) Absent from their billing records is any work with or directed to the SLC with respect to its investigation. (*See id.*)

The SLC members had a conference call on January 15, 2015, but no one from Murphy's firm was present during the call. (January 15, 2015 Executive Committee call notes ("1/15/15 SLC Notes"), attached as Exhibit 7.) This call is the first record of any activity by the SLC since it voted to hire Murphy. Prior to this call, Swehla talked to Brown "regarding issues to present to [the] executive committee" and Swehla "review[ed] a memorandum of law relating to derivative actions and the strategies in filing a motion to dismiss or taking over the case," (4/22/15 Invoice, Ex. 6), but counsel never vetted committee members for independence, never informed committee members with respect to their duties or responsibilities, never recommended experts to assist in any aspect of the required analysis, never discussed the advisability of an interview of League Commissioner Bill Lee, who was by this time four months into an investigation of the very facts at the center of this controversy, or of Washington to understands its perspective.

The notes of the January 15, 2015 SLC call reveal that the committee members discussed the concept of negotiating a settlement with the Zimmerman Defendants, potentially taking over the case, or filing a motion to dismiss. (1/15/15 SLC Notes, Ex. 7.) The notes reveal no investigation by the SLC, because none occurred. (*Id.*) Indeed, during its month-long hiatus the SLC had not interviewed any witnesses, reviewed any documents, undertaken any investigation, or instructed its counsel to undertake any investigation on its behalf. (ECF No. 203-7 (Brown Dep. at 220:4-221:13); ECF No. 203-11 (Malliet Dep. at 83:1-21).)

The first and only reference in the billing records to the business judgment issue before counsel filed the League's motion to dismiss occurred on January 16, 2015. Swehla spent a little over two hours "[r]eview[ing] correspondence from Clint Brown regarding results of executive committee meeting and strategies in proceeding" and "[r]esearch[ing] issues of business judgment rule for board actions and decisions and impact on strategies in proceeding." (4/22/15 Invoice, Ex. 6.) That is, after a month of mapping out a "litigation strategy," and a combined 40 hours of work by Murphy, Landen, and Swehla on the file, this was the first (and only) occasion when Swehla recorded time researching the business judgment rule prior to advising the SLC on a course of action relative to the derivative claims. And even then, Swehla's focus was limited to understanding how the business judgment issue would "impact [the attorneys'] strategies in proceeding." (*See id.*)

**B.  The League's attorneys recommend that the SLC authorize a motion to dismiss.**

On January 19, 2015, Landen and Swehla recorded time preparing for a call with the SLC. (4/22/15 Invoice, Ex. 6.) They then participated in a 48-minute conference call with four of the five members of the SLC and Ysursa. (January 19, 2015 Executive Committee call notes ("1/19/15 SLC Notes"), attached as Exhibit 8; *see also* 4/22/15 Invoice, Ex. 6 (indicating call

lasted 0.80 hours)). Landen and Swehla "provide[d] recommended legal strategies and course of actions for handling pending litigation." (4/22/15 Invoice, Ex. 6.) The specifics of what they said were previously withheld from Washington by Murphy and Landen on the basis of privilege, (*see* ECF No. 217 at 38 of 52), but that information has now been independently provided by the League. The meeting notes reflect that Swehla explained four separate options to the SLC – none of which involved a thorough, good faith investigation by an independent SLC. (1/19/15 SLC Notes, Ex. 8.)

The first option was to "[d]o nothing – allow Washington to proceed with their lawsuit." (*Id.*) Swehla explained that the League "would stand to benefit from anything that happens" in the lawsuit, and that there was an issue of "what the damages actually are – parties would need to see financial statements of league and individual teams." (*Id.*) That is, in this option, counsel noted there may be value to the League in the derivative claims, pending further investigation.

The second option was for the Board to "step in and decide[] to take over settlement of the case." (*Id.*) In response to this approach, Brown stated that he had spoken with Zimmerman and Hanners and that Brown "floated an idea, and feels both heard a cash settlement of $125,000 with $100,000 for travel team and $25,000 for Stu's legal fees." (*Id.*) Notably, this discussion belied a repeated refrain from Murphy and Landen throughout the litigation that the derivative claims were worth no more than $50,000.

Swehla then outlined a third option, one in which the SLC could pursue a motion to dismiss. (*Id.*)  Under this option, the SLC "would need to provide a formal report as part of the motion to dismiss." (*Id.*) As a fourth option, Swehla said that the SLC could vote to approve the demand and take over the lawsuit. (*Id.*)

Landen and Swehla recommended filing a motion to dismiss. (*Id.*) The SLC followed counsel's advice. (*Id.*)

### C. The League's attorneys draft a motion to dismiss premised on an investigation that did not occur.

Counsel's mendacity is highlighted by the sequence of events following the January 19 SLC meeting through the filing of the SLC's first report on February 3, 2015. Murphy, Landen, and Swehla proceeded with drafting the motion to dismiss over the next several days. (4/22/15 Invoice, Ex. 6.) In the middle of this briefing process, Swehla "prepare[d] [an] outline and strategies for league to consider in its investigative report, and include Ohio legal elements for each claim." (*Id.*) That is, this outline of what the SLC should "consider in its investigative report" came after the SLC had already made its decision to seek dismissal.

Murphy filed the motion to dismiss on January 26. (*Id.*; *see* ECF No. 28.) He also signed the brief in support of the motion, representing that "after investigating the claims in the Complaint and weighing its options, the [SLC] unanimously voted to deny the Demand, forego the derivative claims as pursuing them was not in [the League's] best interest, and to seek dismissal of the derivative action." (ECF No. 29 at 4.) Murphy made this representation to the Court while the "investigative report" was still being drafted. (4/22/15 Invoice, Ex. 6.)

In reality, and as the SLC members admitted during their depositions and as revealed in the unredacted SLC meeting notes, the SLC had not undertaken ***any*** investigation prior to seeking the dismissal of this action. Brown even testified that he was unaware that the SLC was required to do so. (ECF No. 203-7 (Brown Dep. at 22:1-4, 255:15-19).) Likewise, Steve Malliet admitted that he felt that the SLC members were unqualified to undertake any investigation themselves and that the SLC did not review anything or interview anyone. (ECF No. 203-11 (Malliet Dep. at 38:2-4, 83:1-84:1).)

As part of their recommended "option 3," the attorneys papered up a Litigation Committee Report (the "Report"). Ysursa prepared the initial draft, which was reviewed and revised by Swehla on January 29 and reviewed by Murphy on January 30, who "work[ed] with" Swehla on it. (4/22/15 Invoice, Ex. 6.) The billing records show that the lawyers were drafting the Report to address the scope of issues in the Report "that would be relevant to the committee's determination of the derivative claims and action . . ." (*Id.*) The "investigative report" was fabricated by counsel to give the Court and Washington the false impression that the SLC had undertaken an investigation.

On February 2, 2015, Swehla corresponded with Ysursa and Brown regarding verifying the Report. Ysursa asked Brown to verify the Report because Sauget, the committee chair, "was in Aruba." (ECF No. 203-10 (Ysursa Dep. at 154:17-20); ECF No. 203-7 (Brown Dep. at 36:1-11).) Brown could not explain why he was the only SLC member to sign the Report and could not say whether the SLC even saw it. (*Id.* at 34:8-35:4, 36:1-11.) Neither could any other member of the SLC. (*See* ECF No. 203-9 (Sauget Dep. at 76:14-78:13); ECF No. 203-11 (Malliet Dep. at 84:5-14); ECF No. 203-12 (Wuerfel Dep. at 124:15-125:19).)[2]

On February 3, 2015, eight days after the League filed its motion to dismiss, Swehla filed the Report. (ECF No. 35.) Even though the Report was prepared exclusively by the attorneys and with zero input from the SLC members, Swehla submitted that the "Report contains the [SLC's] findings regarding Plaintiff Washington Frontier League Baseball, LLC's derivative claims

---

[2] Ysursa claimed that after he wrote the Report, it was distributed to the SLC for review and approval. (ECF No. 203-10 (Ysursa Dep. at 154:21-155:3).) There is no record of that, however. (*See id.* at 156:15-159:4; ECF No. 203-48 (Ex. 137 (privilege log showing the absence of entries associated with the Report)); ECF No. 203-7 (Brown Dep. at 37:8-11); ECF No. 203-11 (Malliet Dep. at 84:5-14); ECF Nos. 203-49, 203-50 (Exs. 138, 139 (League's Feb. 27, 2017 Answer to Interrog. No. 5; June 5, 2017 Supp. Answer to Interrog. No. 5 (showing dates of SLC meetings))).)

asserted in Plaintiff's Complaint." (ECF No. 35.) The Report itself stated that the SLC was directed by the League's board of directors "to investigate all material facts" and that the Report was issued "[a]fter consideration of all material facts." (ECF No. 35, 35-1 at 1.) As detailed above, this is a blatantly false statement.

According to the billing records, from the first date on which counsel began recording time in November through the filing of the Report on February 3, Murphy spent a total of 10.9 hours on this engagement, Landen spent 4.7 hours, and Swehla spent 61.3 hours. None of that time was spent overseeing or conducting a thorough investigation by an independent SLC acting in good faith. (*See* 2/10/15 Invoice, Ex. 2; 4/22/15 Invoice, Ex. 6.)

**D.  The League's attorneys double-down with a second motion to dismiss.**

On February 6, 2015, Washington filed an amended complaint. (ECF No. 36.) The League's attorneys renewed their deceptive conduct. On February 10, Swehla "[r]eview[ed] [the] amended complaint and prepare[d] draft correspondence to send [the] League regarding [the] amended complaint and confirming how we should proceed." (4/22/15 Invoice, Ex. 6.) Swehla emailed Brown and asked him to circulate an email to the SLC "to inform the members of the current status of the case and our intended course of action." (February 10 & 12, 2015 Email Chain between Swehla, Ysursa, Brown, and Murphy, at p.2, attached as Exhibit 9.) In the email, Swehla identified new factual allegations in the amended complaint relating to the expense of the travel team and challenging the business judgment defense (which Swehla described "as a significant hurdle" for Washington to overcome). (*Id.* at 3.)

Ysursa emailed Swehla, copying Brown and Murphy and asking, "Do we need a formal Litigation Report based upon the Amended Complaint? If so I can draft it and circulate to the Committee for approval." (*Id.* at 2.) On February 11 and February 12, 2015, Swehla reviewed the

Report "in light of [the] Amended Complaint to determine if a new report is needed." (4/22/15 Invoice, Ex. 6.) Swehla emailed Ysursa, copying Brown and Murphy, stating that a new report would likely be unnecessary. (February 10 & 12, 2015 Email Chain between Swehla, Ysursa, Brown, and Murphy, Ex. 9, at pp.1-2.)

Even so, on February 12 and 13, Swehla revised the original Report to address the allegations in the amended complaint, conferenced with Ysursa, and corresponded with Murphy "regarding legal strategies and argument in responding [to] the plaintiff's allegation[s] that the Frontier League has not sustained sufficient damages to warrant the cost and expense of litigation." (4/22/15 Invoice, Ex. 6.) Once again, the SLC undertook no investigation; they simply followed counsel's advice. (*See* February 17, 2015 Email chain from Ysursa to Steve Tahsler, copying Bill Lee and Swehla, attached as <u>Exhibit 10</u>.) Swehla drafted another motion to dismiss and supporting brief, which Murphy edited and worked with Swehla to finalize. (4/22/15 Invoice, Ex. 6.)

On February 20, Murphy filed the second motion to dismiss. (ECF No. 41.) In the supporting brief, Murphy doubled-down on his claims of an SLC investigation, writing that the SLC "was charged with investigating the claims in the Complaint" and falsely stating that "[i]n February 2015, after ***fully investigating*** the claims in the Complaint and weighing its options, the [SLC] unanimously voted" to seek dismissal of the derivative action. (ECF No. 42 at 4 (emphasis supplied).) Murphy represented further that the SLC "***has also investigated the claims alleged in the Amended Complaint***, and again seeks dismissal of the derivative action." (*Id.* (emphasis supplied).) In reality, as detailed above, there was no investigation and the lawyers worked out the updated SLC report amongst them.

In a reply brief in support of the motion to dismiss, Murphy again invited the Court to dismiss the derivative claims based on the bogus SLC reports, stating that it was "proper and [the League] is permitted to rely on these Reports for its basis of dismissal." (ECF No. 52 at 4.) Perhaps it would have been proper for the League—and the Court—to rely on "these Reports" had they not been fabricated.

**E.  The League's attorneys block any discovery that would reveal their fraud.**

Prior to filing the second motion to dismiss, Murphy, Landen, and Swehla were already mapping a strategy to prevent discovery of their fraud. On February 19, 2015, Murphy drafted a motion to stay discovery, and Swehla "conference[d] with Jeff Landen regarding legal strategies in proceeding with ESI discovery, and potential concerns regarding pleadings reflecting profit or loss of client." (4/22/15 Invoice, Ex. 6, at 6.) On February 21, 2015, Murphy began a "work-up of Memorandum of Support of Motion for Protective Order." (*Id.* at 7.) On February 23, Swehla "[r]eview[ed] case law regarding limiting discovery while motion to dismiss derivative action is pending" and "[r]eviewed legal strategies in proceeding with motion for protective order and whether motion is ripe." (*Id.*) On February 24, Murphy and Swehla conferred on the motion for protective order and "develop[ed] legal strategies in proceeding." (*Id.*)

On February 25, 2015, the League's attorneys asked the Court for a protective order to "prohibit any discovery from taking place" while its business judgment defense was pending. (*See* ECF Nos. 44, 45 at 6-7.) That same day, Murphy emailed Ysursa a copy of the motion for a protective order, giddy over his plan to block Washington from seeking the discovery needed to support the claims against the Zimmerman Defendants:

> Please send this Motion and Memorandum to the litigation committee members and to the folks who the Plaintiff wants to subpoena. The cases that I attached are right out of that district—in fact, right out of that building. It is right on the beak—no discovery should take place until the motions to dismiss are decided.

> ***This is a nightmare for Washington because the Judge in that case evidently
> took a year to decide the motions to dismiss.*** . . .

(February 25 – March 5, 2015 Email Chain involving Tom Ysursa, attached as <u>Exhibit 11</u>
(emphasis supplied).)

On May 7, 2015, Murphy's deception and intended delay proved successful. In ruling on
the motion for protective order and to stay discovery, this Court relied on Murphy's
representations, finding that, in response to Washington's demand, "the League formed a special
litigation committee ('SLC'). The SLC conducted an investigation and ultimately determined
that it was not in the League's interest to pursue the claims asserted by Washington." (ECF No.
61 at 4.) By relying on Murphy's overtly false representations about an investigation that never
occurred, the Court directly credited the purported "findings of the special litigation committee"
to impose a stay of discovery that would last until September 19, 2016. (*See* ECF No. 61 at 5,
ECF No. 117.) The Court was now an unwitting conscript in counsel's fraud.

## F. Murphy and Landen again deceive Washington and the Court in resisting the Hanners settlement.

On January 20, 2017, Murphy and Landen continued to rely upon their fraudulent SLC
"investigation" and report in urging the Court to reject Washington's settlement agreement with
defendants Hanners and Wickline. (*See* ECF No. 147 at 1-2.) Despite knowing that the SLC
conducted no investigation into Washington's demands for League action, Murphy and Landen
again caused this Court to rely on their assertion about the SLC's business judgment as the
substantive basis to deny Washington's motion to approve the settlement. (*See* ECF No. 152 at
2-4 (Court order reciting that "Frontier formed [an SLC] which, ***after investigation***, issued a
report on February 3, 2015, rejecting the plaintiff's demand that the company pursue the claims"
(emphasis supplied)).) The Hanners settlement languished under the weight of Murphy's and

Landen's bogus business judgment arguments until June 19, 2018, when the Court, post-summary judgment, approved that settlement. (ECF. No. 275.)

> ### G. Murphy and Landen act vexatiously and unreasonably in discovery, forcing Washington to expend costs, expenses, and attorneys' fees to expose the business judgment fraud.

To move this derivative action forward, Washington needed to overcome Murphy's and Landen's representations to the Court regarding the *bona fides* of the SLC. Murphy and Landen vigorously resisted Washington's discovery targeted at the SLC issues, eventually causing Washington to file a motion to compel. (*See* ECF Nos. 159, 161, 162.) During the discovery conference on that issue, Landen described his position with respect to discovery from the SLC as akin to a silent movie, stating that the plaintiffs should not be permitted to do more than "see" the actions of the SLC; they should not be entitled to "hear" what was discussed. In other words, Landen contended that the plaintiffs could discover information related to the SLC's process, but none of the content of what the SLC considered or said. What better way is there to conceal a fraud on the Court than that?

Ultimately the Court granted Washington's motion to compel, which gave Washington a beachhead in its battle to overcome Murphy's and Landen's discovery abuses on the business judgment issue. (*See* ECF No. 174.) Even then, Washington had to assume the role of a detective, gathering documents in discovery from the parties, subpoenaing documents from non-parties, and deposing the League's commissioner, Ysursa, and the SLC members to determine whether the SLC had, in fact, "fully investigated" the allegations in the complaint. As reflected on the Court's docket, this process was extremely difficult, time-consuming, and expensive. (*See* ECF Nos. 153, 154, 155, 159, 161, 162, 166, 168, 169, 171, 173, 174, 175, 178, 188, 192, 193, 197, 200.)

Ironically, even Murphy and Landen recognized the extensive costs, expenses, and fees incurred by Washington in pursuing this discovery. In the League's summary judgment brief, which Murphy signed, the attorneys acknowledged that Washington "serv[ed] the League with extensive discovery in an attempt, as Plaintiffs argue, to determine whether the process by which the [SLC] reached its conclusion was thorough, independent and conducted in good faith." (ECF No. 177 at 3; *see* June 26, 2017 Murphy Landen Jones PLLC Invoice and July 18, 2017 Murphy Landen Jones PLLC Invoice, attached as Exhibits 12 and 13 (identifying work by Murphy and Landen in preparing brief).) Murphy and Landen bemoaned the extensive discovery and litigation, describing it as "time-consuming and expensive." (ECF No. 177 at 3.) What Murphy and Landen failed to acknowledge is that they caused this time and expense through their own material misrepresentations about the SLC and its process.

## H. Murphy and Landen continue the business judgment fraud at summary judgment.

On Saturday, June 3, 2017, Murphy filed the League's motion for summary judgment. (ECF No. 176.) Murphy wrote in the summary judgment brief, without qualification, that "the Litigation Committee's Report was the product of a thorough, independent investigation conducted in good faith." (ECF No. 177 at 11.) He also falsely wrote:

> Finally, as is manifest on the face of Litigation Committee's Report itself (ECF 42-1) as well as on the face of the recent Supplemental Report dated May 22, 2017 (attachment to Exhibit 2), the Litigation Committee's recommendations are the product of a thorough review and sound legal analysis. Moreover, the Litigation Committee actually assumed the facts as alleged by Washington to be true. The Litigation Committee also met multiple times to discuss this Litigation and the facts which are at issue in this Litigation. In light of this thorough investigation, the Litigation Committee decided, in its business judgment, not to pursue this litigation due to the lack of business justification for pursuing what amounted to at most a $50,000 lawsuit in the face of significant practical downsides.

(ECF No. 177 at 8.)

Comparing this description of the SLC's actions to the unredacted January 19, 2015 meeting notes reveals the abject lie in these representations. Murphy and Landen blatantly misrepresented to the Court that the SLC issued its report based on the SLC's findings, which, they said, were the product of a thorough investigation. In reality, the SLC notes show that the SLC's report was an after-the-fact fabrication written by the lawyers to provide cover for their recommendation to seek the dismissal of, and to cause the Court to rely on the false representations to dismiss, the derivative claims. (*See* 1/19/15 SLC Notes, Ex. 8.)

## I.   **After their business judgment fraud is exposed, Murphy and Landen change their story and blame Washington.**

After being confronted at summary judgment with the evidence painstakingly collected by Washington during discovery showing that the assertions of a "full investigation" were false, Murphy and Landen suddenly (and tellingly) changed their story about how the SLC reached its decision. Specifically, in the summary judgment reply brief they authored, signed, and filed, Murphy and Landen stated:

> In the face of Plaintiffs' premature derivative suit, [the League] formed a Special Litigation Committee ('SLC'). It is undisputed that the Committee relied on the legal analysis of its counsel regarding the claims, as described in the Affidavit of Thomas Ysursa, Esq. (See ECF # 177-2). Mr. Ysursa's affidavit also establishes that, in conducting his analysis, he assumed the facts asserted by Mr. Williams to be true. . . . It is undisputed that the Committee members decided to accept the recommendation of its counsel that the purported derivative claims would yield, at best, a limited recovery for [the League], concluding that it would not be in the best interests of [the League] to pursue those claims.

(ECF No. 221 at 2; *see* Dec. 31, 2017 Murphy Landen Jones PLLC Invoice, <u>Exhibit 14</u> (identifying work by Murphy and Landen in preparing reply brief).)[3] This description of events

---

[3] As demonstrated at summary judgment, this version of the SLC's process contradicts what Murphy and Landen had been telling the Court and Washington for years about the full

was vastly different from previous reports of a complete or thorough investigation and contradicts the SLC notes from January 19, 2015.

Rather than ending the business judgment charade and for the first time fulfilling their obligation of candor, the attorneys took one more shot at covering their fraudulent, vexatious conduct. Remarkably, they went on the offensive, accusing Washington of "pointlessly prolonging the case" and "hiding behind inappropriate assertions of attorney-client privilege" all in violation of Section 1927. (ECF No. 221 at 19.) Murphy and Landen even recognized the "litigation 'pain'" from the "expansive discovery" in the case, (*see id.*), once again ignoring that the discovery was necessitated by their mendacity.

Acknowledging the evidence Washington marshaled from discovery "to support [its] argument that the business judgment rule does not apply: deposition testimony from members of the Frontier League's SLC, deposition testimony from members of the board of directors of the Frontier League, deposition testimony from Commissioner Lee, deposition testimony from the Frontier League's in-house counsel, deposition testimony from Defendant Zimmerman, email exchanges, meeting minutes, a proposed settlement agreement, and other documents (see generally Filing No. 203; Filing No. 204; Filing No. 218)," (ECF No. 238 at 17), the Court saw through it all. Based on the evidence, the Court expressed "serious doubts about the independence of the SLC members and about a thorough investigation being conducted" because "[t]he evidence suggests that the SLC members predetermined not to pursue the claims and to quickly end the litigation without fully investigating the facts and determining the value of the claims." (ECF No. 238 at 23.) The Court continued, "Some SLC members explained that they were going to rely on Commissioner Lee's investigation and report in place of their own

---

investigation undertaken by the SLC, and was not even consistent with what Ysursa said in his affidavit. (*See* ECF No. 222 at 9-11 of 13.)

investigation, yet the SLC issued its litigation report and filed it with the Court before Commissioner Lee's report was even finalized." (*Id.*) Thus, "[b]ecause some of the members of the SLC were not independent and because a thorough investigation was not performed by the SLC before issuing its litigation reports, the Court determine[d] that the SLC's business decision to not pursue this litigation [was] not entitled to deference." (*Id.* at 24.)

### III. SANCTIONS ARE APPROPRIATE BECAUSE MURPHY AND LANDEN PROMULGATED A FRAUD ON THE COURT.

Sanctions are proper under the Court's inherent authority based on counsel's knowing perpetuation of a fraud with respect to an SLC investigation that never happened. *Secrease*, 800 F.3d at 402 ("falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system"). Sanctions are also appropriate under Section 1927 because this purported investigation upon which Murphy and Landen based their entire legal strategy never occurred. *Lightspeed Media Corp.*, 761 F.3d at 708 (sanctions are appropriate "where a claim [is] without a plausible legal or factual basis and lacking in justification"). Indeed, the courts have readily imposed sanctions in cases where a party's attorney maintains a position he or she knows to be false. *See, e.g., Boyer v. BNSF Railway Co.*, 832 F.3d 699, 701 (7th Cir. 2016) (sanctions against party for filing case in wrong forum despite knowing it was improper forum); *Hunt*, 861 F.3d at 661 (sanctions where party's "efforts to avoid arbitration were meritless"). *Intellect Wireless, Inc. v. Sharp Corp.*, 87 F. Supp. 3d 817, 848 (N.D. Ill. 2015) ("Niro's attorneys failed to carry out that duty in this case, instead filing an amended complaint that repeated the misleading Smithsonian statements and continued to pursue infringement claims on a patent Niro's attorneys either knew or should have known was unenforceable."). The policy behind a sanctions award based on such conduct is simple: "Even if it is not successful, the effort imposes

unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Secrease*, 800 F.3d at 402.

Here, Murphy's and Landen's false representations about what the SLC supposedly did, and their intention for the Court to rely on those misrepresentations, are sanctionable. *See Chamber*, 501 U.S. at 46 ("if a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party") (internal quotations omitted)). As the evidence confirms, there was no factual basis for positions advocated by Murphy and Landen concerning the SLC. By way of multiple examples, Murphy and Landen, intending to have the Court rely on their fabrications while inflicting economic harm and delaying the administration of justice, did all of the following:

- In the first motion to dismiss, Murphy stated that "[o]n January 19, 2015, *after investigating the claims in the Complaint* and weighing its options, the [SLC] unanimously voted" to reject the derivative action. (ECF No. 29 at 4 (emphasis supplied).)

- Likewise, the SLC Report stated the SLC was "directed to investigate all material facts" and that the report was issued "[a]fter consideration of all material facts." (ECF No. 35, 35-1 at 1.)

- In the second motion to dismiss, Murphy stated that "[i]n February 2015, *after fully investigating the claims* in the Complaint and weighing its options, the [SLC] unanimously voted" to seek dismissal of the derivative action. (ECF No. 42 at 4 (emphasis supplied).) Murphy represented further that its SLC "has also investigated the claims alleged in the Amended Complaint, and again seeks dismissal of the derivative action." (*Id.* (emphasis supplied).)

- In pursuing a stay of discovery, Murphy argued that the League's "duly appointed [SLC] has since the filing of the Complaint voted to deny Washington's demand, and to dismiss the derivative action." (ECF No. 45 at 4.)

- In opposing the Hanners settlement, Murphy argued that Washington should not be permitted to "end run" the League's business judgment defense, which would be addressed on "an early motion for summary judgment." (ECF No. 147 at 3.)

- The summary judgment brief, prepared under the direction of Murphy and Landen and signed by Murphy, stated that "the Litigation Committee's Report was the

product of a thorough, independent investigation conducted in good faith." (ECF No. 177 at 11.)

- Even at the January 16, 2018 oral argument on the League's motion for summary judgment, when questioned by the Court about the apparent lack of an investigation, Murphy suggested that no investigation was necessary because the SLC assumed certain facts to be true, which is a marked departure from the written summary judgment statements Murphy had made about the "thorough investigation" conducted by the SLC.

Counsel's statements set forth above are and were objectively, blatantly false. Murphy and Landen intended for the Court to rely on them to take substantive action, and at times (*e.g.,* securing a stay of discovery, delaying the Court's approval of the Hanners settlement), they were successful. Put simply, from the beginning of the case to the end, Murphy and Landen promulgated the myth that the SLC completed a full and thorough investigation. This is verifiably untrue, yet Washington lost valuable time and spent hundreds of thousands of dollars in attorneys' fees and litigation expenses getting to the bottom of Murphy's and Landen's spurious justifications for their business judgment arguments.

Murphy and Landen knew that no investigation had occurred. Rather than advise the SLC on the proper course of action for the SLC to exercise its business judgment, namely, to ensure that the SLC was independent and conducted a thorough investigation in good faith, they instead developed a "legal strategy" that included a fraud upon this Court as a key element.[4] They advised the League on a course of action—dismissal—and then fashioned a report to justify that advice—a report that would undergird everything that happened in this case for the next three years.

---

[4] For example, Murphy and Landen could have followed up on questions about the value of the derivative claims, or engaged an accountant, economist or other professional to consider the value of the lost opportunity, or sought to interview Williams, whose team was the proponent of the derivative claims, or even coordinated with League Commissioner Bill Lee on the investigation he was conducting into Washington's internal League complaint.

This deliberate course of conduct imposed significant litigation costs on the parties through motions practice, written discovery, and depositions. And these costs were not borne by the parties alone. This Court was forced to expend precious judicial resources in ruling on numerous discovery disputes and summary judgment filings that were premised entirely on Murphy and Landen's false claims about the SLC's process. (*See* ECF Nos. 61, 73, 152, 159, 173, 174, 179, 191, 200, 234, 238); *see also Nehi Beverage Co. v. Petri*, 537 N.E.2d 78, 80 n.1 (Ind. Ct. App. 1989) (citing Rule of Professional Conduct, Rule 3.3 and finding that attorney "breached his professional responsibility to [the] court" because "[h]is inaction . . . required [the court] to assume the role of judicial 'detective' to ferret out the truth of this matter, expending in the process an inordinate amount of judicial time in that pursuit to the detriment of other litigations . . . ."). There can be no more appropriate or just case for sanctions than the present one.

Indeed, if this case isn't appropriate for sanctions under the Court's inherent authority or Section 1927, it is hard to identify a case that would be. Murphy and Landen are seasoned attorneys who knew all along that the foundation of their strategy in response to the derivative claims—a thorough investigation conducted in good faith by an independent SLC—was not true. *Cf. Taflinger v. Hindson*, 870 F. Supp. 2d 598 (S.D. Ind. 2012) (conduct of inexperienced attorney who lacked access to discovery information not sanctionable). They knew this because they were the ones who wrote the SLC reports and signed the filings containing the untrue statements detailed above. In other words, they plotted a course to put the lawsuit in the rearview mirror, recommended that their client follow that strategy, concocted two SLC reports to make it appear as if an investigation had occurred, repeated the falsehood to this Court on multiple occasions, and then fought like crazy to avoid discovery. As Murphy gleefully described it, they

set up a "nightmare for Washington." (Ex. 11.) Murphy and Landen have no excuse for their intentional misconduct. They must be held accountable.

## IV.    WASHINGTON IS ENTITLED TO RECOVER THE LITIGATION EXPENSES IT WAS FORCED TO EXPEND TO UNCOVER AND DEFEAT THE BUSINESS JUDGMENT FRAUD

The starting point for the calculation of attorneys' fees is "the product of the number of hours reasonably expended and a reasonable hourly rate." *Fritcher v. Health Care Serv. Corp.*, 301 F.3d 811, 819 (7th Cir. 2002) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983)). To that end, Washington has prepared an itemized exhibit detailing the reasonable attorneys' fees, costs, and expenses incurred as a result of being forced to rebut Murphy and Landen's business judgment fraud. *See* Declaration of Andrew McNeil ("McNeil Decl.") at ¶¶ 7-10 (Appendix, Exhibit 15). The calculation is based on the amount of time actually expended in responding to the purported business judgment issues multiplied by the market rate for each attorney or paralegal who worked in prosecuting the action. *See McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 519 (7th Cir. 1993) (describing a "reasonable hourly rate" as "the rate that lawyers of a similar ability and experience in the community normally charge to their paying clients for the type of work in question" (citation omitted)).

Plaintiffs' counsel, and specifically the undersigned, reviewed all fees and expenses incurred in this case and identified those fees and expenses attributable to dealing with Murphy's and Landen's representations about an SLC investigation that never happened. This generally includes motions practice, written discovery and the related squabbles, document review, seeking the approval of the Hanners settlement, depositions addressing the business judgment issue, assembling all of the summary judgment evidence that conclusively defeated the asserted business judgment argument, preparing the written summary judgment response and sur-reply,

and the time spent preparing this motion for sanctions. None of this effort, and therefore cost, would have been necessary but for Murphy's and Landen's fraud on the Court and the parties.

Based on this approach, plaintiffs' counsel has determined that the amount of reasonable attorneys' fees and expenses incurred in this case and related to the business judgment fraud is at least $324,037.26. *See* McNeil Decl. at ¶¶ 7-10. This amount includes $308,797.92 in attorney fees (through July 3, 2018) and $15,239.34 in costs and expenses, subject to any additional fees incurred as a result of pursuing this motion for sanctions. (*Id.*) This amount is eminently reasonable when considered next to the $316,609.77 in costs, expenses, and attorneys' fees charged by Murphy and Landen changed the League in perpetuating their fraud. (*See* Invoices from Graydon Head, Kevin L. Murphy PLLC, and Murphy Landen Jones PLLC from November 2014 to June 2018, attached collectively as <u>Exhibit 16</u> (Nov/Dec 2014 ($4,101.19); Jan/Feb 2015 ($24,912.88); Mar/Apr 2015 ($5,907.24); May 2015 ($3,161.12); June/July 2015 ($2,145.00); June 2015 ($1,540.22) (from Graydon Head); July 2015 (Oct/Nov/Dec 2015 ($6,184.10); Jan 2016 ($2,402.68); Feb 2016 ($198.00); Mar 2016 ($478.50); June 2016 ($132.00); Sept 2016 ($766.50); Oct 2016 ($6,362.00); Nov 2016 ($7,927.00); Dec 2016 ($10,456.00); Jan 2017 ($17,489.50); Feb 2017 ($26,309.03); Mar 2017 ($20,188.28); Apr 2017 ($10,872.50); May 2017 ($19,963.50); June 2017 ($52,500.00); July-Dec 2017 ($92,504.53); Jan/Feb 2018 ($9,841.70); Apr 2018 ($408.00))).

## V.   CONCLUSION

But for Washington's doggedness, Murphy and Landen may well have succeeded in deceiving the Court with their false representations about the SLC's non-investigation. This abusive conduct, perpetrated in a derivative lawsuit while representing a not-for-profit corporation, should be called out for what it is, namely, vexatious and unreasonable. Murphy and

Landen, as the perpetrators of this conduct, should be held accountable for the excess costs, expenses, and attorneys' fees Washington incurred in response to that conduct. Washington respectfully requests that this Court order Murphy and Landen to pay it $324,037.26, subject to any additional amounts associated with this motion for sanctions.

Respectfully submitted,

s/*Andrew M. McNeil*
Andrew M. McNeil (#19140-49)
Philip R. Zimmerly (#30217-06)
Mark A. Wohlford (#31568-03)

BOSE McKINNEY & EVANS LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
(317) 684-5000; (317) 684-5173 (Fax)
AMcNeil@boselaw.com
PZimmerly@boselaw.com
MWohlford@boselaw.com

*Attorneys for Plaintiffs, Washington Frontier*
*League Baseball, LLC, and Stuart A. Williams*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2018, a copy of the foregoing "Plaintiffs' Brief in Support of Motion for Sanctions" was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

| | |
|---|---|
| Jacques Condon, Esq.<br>Condon Law Firm, LLC<br>118 North Green Bay Road, Suite 3<br>Thiensville, WI 53092<br>Jacques@condon-law.com | Steven M. Badger<br>Barnes & Thornburg LLP<br>11 South Meridian Street<br>Indianapolis, IN 46204<br>Steve.badger@btlaw.com |
| Bernie W. (Too) Keller, Esq.<br>Eric J. Neidlinger, Esq.<br>Keller Macaluso LLC<br>760 3rd Avenue SW, Suite 210<br>Carmel, IN 46032<br>too@kellermacaluso.com<br>eneidlinger@kellermacaluso.com | Linda L. Pence, Esq.<br>Smith Amundsen LLC<br>Capital Center, South Tower<br>201 North Illinois Street, Suite 1400<br>Indianapolis, IN 46204<br>linda.pence@comcast.net |

s/*Andrew M. McNeil*

3451768