UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| WASHINGTON FRONTIER LEAGUE BASEBALL, LLC, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 1:14-cv-01862-TWP-TAB ) |
| MICHAEL E ZIMMERMAN, et al., | ) ) |
| Defendants. | ) ) ) |
| MURPHY LANDEN JONES PLLC, et al., | ) ) |
| Interested Parties. | ) ) |
| NORMAL PROFESSIONAL BASEBALL CLUB, LLC, et al., | ) ) ) |
| Miscellaneous. | ) |

**REPORT AND RECOMMENDATION
ON PLAINTIFFS' MOTION FOR SANCTIONS**

**I.   Introduction**

At issue is Plaintiffs' motion for sanctions against attorneys Kevin L. Murphy and Joseph Jeffrey Landen, who represented Frontier League Baseball, Inc. (the "League") in this matter. Plaintiffs ask the Court to invoke both its inherent authority and 28 U.S.C. § 1927 to sanction Murphy and Landen personally a minimum of $324,037.26. Plaintiffs' motion focuses on a legal argument Murphy and Landen made in a variety of motions. Plaintiffs contend that Murphy and Landen knowingly asserted a baseless defense, thereby perpetrating a fraud on the Court and unreasonably and vexatiously multiplying the proceedings.

To be sure, Murphy and Landen's conduct should not be emulated. But does this conduct support assessing over $324,000 in sanctions? It does not. Murphy and Landen at least have

some explanation for each allegation against them. Given that this litigation has stretched on for three and a half years, there has been ample opportunity for missteps. Ultimately, the parties reached a settlement, only to result in more litigation and, now, a motion seeking a hefty sanctions award. Given all involved, further action by way of sanctions is not appropriate. Prior to his elevation to the Seventh Circuit Court of Appeals, Judge John Daniel Tinder likewise faced a motion for sanctions. Judge Tinder observed that "winning ought to be enough . . . . There is no need to scorch the field on which the battle was fought." *McDaniel v. Eaglecare, Inc.*, IP 00-0413-C-T/K, slip op. at 7 (S.D. Ind. Sept. 27, 2002). Judge Tinder's wisdom applies equally here. As discussed below, Plaintiffs' motion for sanctions [Filing No. 311] should be denied.

## II.   Background

Plaintiffs Washington Frontier Baseball, LLC, and Stuart A. Williams brought suit against several individuals and entities, including W. Chris Hanners and Michael Zimmerman, both personally and derivatively on behalf of the League. Plaintiffs alleged that Defendants worked together to make a deal with the City of Kokomo for a new baseball team, and in so doing, conspired to breach fiduciary duties Hanners owed to the League, tortuously interfered Plaintiffs' contracts, and unjustly enriched themselves. After years of litigation, Plaintiffs and Defendants settled their disputes.

In response to the suit, the League formed a Special Litigation Committee, and that SLC issued a report recommending the League oppose Plaintiffs' derivative suit.[1] The League adopted the recommendation and opposed Plaintiffs' suit throughout the litigation. The League filed two motions to dismiss based on multiple arguments, including that the SLC's

---

[1] Plaintiffs dispute the authenticity of the first report.

determination is entitled to deference and the suit should be dismissed. The League succeeded in a motion to stay discovery, which the Court granted in part due to questions regarding "whether any pleaded derivative claims can survive despite the League's decision, in accordance with the findings of the [SLC], not to pursue those claims." [Filing No. 61, at ECF p. 5.] The League convinced the Court to reject (temporarily) a settlement Plaintiffs and defendants reached, with the Court again pointing to the SLC's decision as its reason for deferring to the League. [Filing No. 152, at ECF pp. 2.] Murphy and Landen reiterated this argument and asserted two others in the motion for summary judgment they filed on behalf of the League. [Filing No. 177, at ECF p. 6-8.]

The Court denied the League's motion for summary judgment, finding that the League's decision not to pursue the claims in court was not entitled to deference under the business judgment rule. Under Ohio law,[2] courts defer to an entity's business judgment regarding whether to pursue a derivative claim when the decision is made following a thorough, good faith investigation conducted by a litigation committee comprised of independent, disinterested members. *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1343 (Ohio Ct. App. 1990). The Court expressed "serious doubts" about whether the elements of the rule were satisfied. [Filing No. 238, at ECF p. 23.] In finding that the SLC's decision was not entitled to deference at the summary judgment stage, the Court noted that "[t]he evidence suggests that the SLC members predetermined not to pursue the claims and to quickly end the litigation without fully investigating the facts and determining the value of the claims." [*Id.*] The Court also questioned the independence of the SLC, citing evidence that some SLC members failed to disclose to the

---

[2] The parties agree that Ohio substantive law provides the rule on this point.

League's directors and the other SLC members that they had "business dealings . . . directly related to the subject matter of this litigation." [*Id.*]

Following settlements with Defendants, the League obtained its file from the law firm at which Murphy and Landen worked when they represented the League in this matter. The League provided this file, which contained its communications with attorneys Murphy and Landen, to Plaintiffs. Based on this and other evidence they acquired through discovery, Plaintiffs argue Murphy and Landen knew the SLC did not meet the requirements for deference, but nonetheless repeatedly and in bad faith argued otherwise. Murphy and Landen respond that the SLC's decision was entitled to deference and their arguments were made in good faith.

### III. Discussion

In support of their request for sanctions of at least $308,797.92 in attorney fees and $15,239.34 in costs and expenses, Plaintiffs argue Murphy and Landen committed fraud on the Court and repeatedly relied on the SLC's decision in bad faith, which caused this case to drag on at great expense to Plaintiffs. Plaintiffs point to evidence suggesting that, at the behest of SLC member Clint Brown, Murphy and Landen fabricated much of the support for the SLC theory in an effort to quickly end the litigation. Plaintiffs also contend that Murphy's dealings with Brown made him aware that Brown had an interest in the events underlying the derivative suit, which would mean Murphy knew at least one SLC member was not independent and disinterested. Murphy and Landen respond, not only that they had a good faith basis to make the business judgment rule arguments, but that the rule was satisfied and the SLC should have been given

deference.[3]  They further argue that Ohio law regarding whether an SLC member is independent and disinterested favors their position.

Under the business judgment rule, courts are required to dismiss derivative claims in deference to an entity's business judgment when the entity adopts the findings of an SLC that meets certain conditions.  *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1341-42 (Ohio Ct. App. 1990).  Unlike some states, Ohio prohibits courts from making an independent determination of the business's best interests.  *Id.* at 1342 (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779, 786-87 (Del. 1981).  Instead, courts must defer to the SLC's decision "where: (1) the SLC is comprised of independent, disinterested trustees; (2) the SLC conducts its inquiry in good faith; and (3) the committee's recommendation is the product of a thorough investigation." *Id.* at 1343. Plaintiffs allege Murphy and Landen knew none of the elements was satisfied.

   a. **Authenticity of the SLC's First Report**

In support of the League's first motion to dismiss, the League filed a report purporting to contain the SLC's recommendation and analysis.  [Filing No. 35-1.]  Plaintiffs allege that Murphy and Landen committed fraud on the Court by submitting a fabricated report.  In sum, the report stated that the SLC concluded Plaintiffs' suit was not in the League's best business interest because the League only had standing to seek a maximum of $50,000, a public feud would be harmful to the league's efforts to attract new owners, and the claims against Zimmerman were likely governed by Ohio law, which did not recognize the cause of action. Plaintiffs allege the SLC did not reach this conclusion, but rather it was Murphy and Landen's,

---

[3] Murphy and Landen do not ask the Court to reconsider its entry on the League's motion for summary judgment.  Defendants filed a motion to reconsider, but neither Defendants nor the League included arguments regarding the Court's ruling regarding the business judgment rule. [Filing No. 261 (Brief in Support of Motion for Reconsideration asking the Court to reconsider its rulings on (1) Plaintiffs' individual claims, (2) choice of law, and (3) available damages).]

and the report itself was faked. Murphy and Landen respond that the report unquestionably reflects the SLC's opinion, and even if it was not adopted, they had no reason to suspect the report was not authentic.

Plaintiffs cite evidence that calls into question the authenticity of the report. First, Murphy and Landen controlled the drafting process. Murphy and Landen's colleague Nathaniel Swehla drafted an outline of the report and gave it to League attorney Tom Ysursa, who was a non-voting member of and legal counsel to the SLC. [Filing No. 331-29.] Ysursa turned the outline into a draft report. [*Compare* Filing No. 35-1 *with* Filing No. 331-29.] Swehla then redlined the draft, and Murphy approved it, noting that it would "just kill" Plaintiff Williams. [Filing No. 331-30, at ECF pp. 1, 3.]

Second, and more disturbing, it appears that the SLC may not have adopted the report. The only SLC member to sign the report was Clint Brown, who Plaintiffs allege conspired with Murphy to try to get the suit dismissed as quickly as possible. The other SLC members testified that they did not remember seeing this report. Ysursa testified that he emailed the report to them all, but Plaintiffs point out that, despite this being a discovery topic, the emails were neither produced nor listed in the privilege log.

While these allegations are troubling, Plaintiffs fail to show Murphy and Landen committed a fraud on the Court. The Court is not convinced that Murphy and Landen fabricated the report's contents. It is not unusual for attorneys to draft official documents, so their involvement in creating the report is not surprising. Additionally, the SLC meeting minutes reflect the conclusions in the report. [Filing No. 326-13; Filing No. 326-14.] And it is undisputed that the SLC adopted the second version of the report, which was updated with

responsive details following Plaintiffs' amended complaint, but was otherwise the same. [*Compare* Filing No. 35-1 *with* Filing No. 42-1.]

Likewise, the Court is not prepared to conclude that attorney Ysursa lied under oath when the only evidence is that the SLC members do not remember whether they adopted the report and some emails are missing. The SLC members did not affirmatively testify that they did not adopt the report. And given that there were thousands of pages of discovery, it is just as reasonable to conclude the emails were merely missed as it is to conclude they never existed. Further, as Murphy and Landen argue, even if Ysursa did not properly distribute the report or ensure each SLC member adopted the report, Ysursa testified that he told Murphy and Landen that he did. Plaintiffs fail to show Murphy and Landen had reason to question the veracity of their client's attorney representative.

### b. Thorough Investigation

Plaintiffs argue Murphy and Landen knew the SLC did not conduct a thorough investigation, as required by *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1343 (Ohio Ct. App. 1990). It is true that the SLC did not conduct a thorough investigation. The Board designated the SLC in December 2014. It had its first meeting on January 15. And on January 19, the SLC chose between four options presented by the League's lawyers, opting to seek dismissal of Plaintiffs' claims. Though the SLC assumed Plaintiffs' factual allegations were true, it did not conduct a factual investigation. The total extent of the SLC's "investigation" was their personal knowledge from "living" the Kokomo problem, information from League Commissioner Bill Lee's investigation that happened to come up when Lee attended SLC meetings, and the legal research conducted by Murphy, Landen, Swehla, and League attorney Ysursa.

Nevertheless, the Court will not sanction attorneys simply because they made a losing argument. Rather, sanctions under the Court's inherent authority are appropriate when the attorney "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Martinez v. City of Chicago*, 823 F.3d 1050, 1052 (7th Cir. 2016) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45, 56 (1991)). Sanctions may also be appropriate under 28 U.S.C. § 1927 when an attorney "'so multiplies the proceedings in any case unreasonably and vexatiously' that the lawyer should be responsible for the excess costs, expenses, and attorney's fees borne by the other side." *Hunt v. Moore Brothers, Inc.*, 861 F.3d 655, 660 (7th Cir. 2017) (quoting 28 U.S.C. § 1927), reh'g denied (July 31, 2017), cert. denied sub nom. *Rine v. Moore Bros., Inc.*, 138 S. Ct. 671 (2018).

Plaintiffs argue that Murphy and Landen knew the SLC did not conduct a thorough investigation. Plaintiffs point to the fact that the SLC meeting minutes show no investigation, the SLC members admitted that they did not do a factual investigation, and Murphy and Landen's billing records show no time billed for investigating. Murphy and Landen respond that Plaintiffs unreasonably limit the scope of the SLC's actions, eliminating significant investigative efforts. Murphy and Landen further argue that no factual investigation was necessary because the SLC took Plaintiffs' allegations against Hanners and Zimmerman to be true. These arguments fall well short of demonstrating a thorough investigation, but are enough to stave off sanctions.

One way Murphy and Landen argue the SLC conducted a thorough investigation is by referring to many meetings at which "the Committee" discussed and deliberated what to do about Hanners' and Zimmerman's interference in Kokomo, as well as Plaintiffs' lawsuit. Murphy and Landen cite 14 meetings going back as early as June 23, 2014, where the topics were considered. The problem with this theory is that Murphy and Landen use the phrase "the Committee" to refer

to both the SLC and the Executive Committee as if they were the same thing, and even include two Board meetings in the tally.

The Executive Committee and Board are distinct from the SLC, and the Executive Committee's and Board's meeting discussions are not an SLC investigation. While it is true that the Board designated the Executive Committee to serve as the SLC, the membership of the Executive Committee varied over that period and membership was revamped when the League held elections going into 2015. Williams was even on the Executive Committee for many of these meetings, which goes against the SLC's purpose of insulating the decision from interested parties. The SLC was made up of five voting members—Clint Brown, Steve Malliet, Nick Semaca, Rich Sauget, and Leslye Wuerfel—and three non-voting members—the Commissioner, the Assistant Commissioner, and Ysursa. Though the non-voting members of the SLC were present at most of the Executive Committee meetings, only Sauget and Wuerfel were consistent voting members of the Executive Committee. Further, in his affidavit in support of the League's motion for summary judgment, Ysursa listed only nine Executive Committee and SLC meetings, which do not match up with the 14 Murphy and Landen now list. [*Compare* Filing No. 177-2, at ECF p. 1, ¶ 1 *with* Filing No. 325, at ECF pp. 5-7.]

Murphy and Landen argue that because the Board designated the Executive Committee as the SLC, Executive Committee action preceding the designation should be considered SLC action. After all, the meeting minutes do not distinguish between SLC meetings and Executive Committee meetings. And as Murphy and Landen point out, the SLC members present at those meetings heard, and in some instanced participated, in the arguments for and against Plaintiffs' suit. Williams made arguments in favor of suing Defendants at several of the listed meetings. This is not a thorough investigation, but it is background knowledge that the SLC members had

9

to inform their decision. As noted above, this is a losing argument, but it is not so deficient as to be objectively bad faith. *See Hunt v. Moore Brothers, Inc.*, 861 F.3d 655, 659 (7th Cir. 2017) ("objective bad faith will support a sanctions award") (citation omitted).

Murphy and Landen also argue Plaintiffs unreasonably exclude the Commissioner and Assistant Commissioner's investigation. The Commissioner and Assistant Commissioner investigated the allegations that Hanners and Zimmerman diverted the Kokomo expansion (the basis underlying Plaintiffs' derivative claims). This investigation ended in a 44-page, single spaced report and a $100,000 fine against Hanners.

Like including Executive Committee meetings, including the Commissioner's investigation is problematic. Yet it was not objective bad faith for Murphy and Landen to rely on the investigation as support for the SLC meeting *Miller*'s thorough investigation requirement. The Commissioner did not finish his investigation and report until after the League filed the SLC's report in conjunction with its first motion to dismiss. The Commissioner did not share drafts of his report with the SLC or explicitly provide updates before or after the League filed the SLC's report. Murphy and Landen argue that information from the Commissioner's investigation still made it to the SLC members because the Commissioner and Assistant Commissioner were non-voting members of the SLC and Ysursa worked with both the SLC and the Commissioner's investigation. According to Ysursa's deposition, though the Commissioner never explicitly held the floor of an SLC meeting to discuss his investigation, both the Commissioner and Ysursa talked about information from the report as it naturally came up in SLC meetings. Again, this is not convincing evidence of a thorough investigation by the SLC, but it shows SLC members gained relevant information such that including it as support is not objective bad faith.

10

Regarding both the Executive Committee discussions and the Commissioner's investigation, Plaintiffs argue that Murphy and Landen acted in subjective bad faith by including them as part of the SLC's investigation. *Hunt v. Moore Brothers, Inc.*, 861 F.3d 655, 658-59 (7th Cir. 2017) ("subjective bad faith is sufficient to support section 1927 sanctions"). Plaintiffs contend that, as stated in the SLC's report, the League's board "directed it to investigate all material facts and to manage the lawsuit in the best interest of the Frontier League." [Filing No. 35-1, at ECF p. 1.] According to Plaintiffs, if the Board intended the SLC to rely on prior Executive Committee discussions or the Commissioner's investigation, the Board would have said so and the SLC would have included it in its report. This argument is unpersuasive. Plaintiffs do not show evidence that the Board forbade the SLC from looking to outside sources to aid its investigation. Although semantics in instructions can be important, the distinction Plaintiffs attempt to draw does not evidence subjective bad faith on the parts of Murphy and Landen. Further, Plaintiffs fail to identify a smoking gun showing Murphy and Landen subjectively knew that they could not include Executive Committee discussions as part of the SLC's investigation.

In their reply in support of their motion for summary judgment, as well as at the oral argument, Murphy and Landen argued that no factual investigation was necessary because the SLC took Plaintiffs' allegations as true. In taking the allegations as true, Murphy and Landen argued, all that was left to investigate was what the League could expect to gain from the suit, i.e. the legal sufficiency of, and legal remedies for, Plaintiffs' derivative claims. Plaintiffs argue this amounts to an admission that the SLC failed to conduct a thorough factual investigation. They contend that Murphy and Landen "changed their story" after Plaintiffs laid out in their

11

response to the League's motion to summary judgment all of their evidence that the SCL did not conduct a thorough investigation. [Filing No. 312, at ECF pp. 18-19.]

This shift in the argument does not show bad faith on the part of Murphy and Landen. Rather than an admission that the SLC's investigation was insufficient, the shift is more akin to an alternative argument. As far back in this litigation as the SLC's first report, the SLC included the fact that it assumed Plaintiffs' allegations were true. [Filing No. 35-1, at ECF p. 1.] In support of the League's motion to dismiss, Murphy and Landen argued on behalf of the League that the investigation was sufficient, but shifted their focus to this point when they rightly perceived that the Court suspected the SLC's investigation was insufficient.

In sum, Plaintiffs show that the SLC's efforts fell well short of the thorough investigation required by *Miller*, but to be entitled to sanctions against Murphy and Landen, Plaintiffs must show the attorneys acted in bad faith by arguing the thorough investigation element was satisfied. Plaintiffs' efforts on this front come up short. As Murphy and Landen argue, their use of a broad definition of "investigation" to include a legal investigation and the SLC members' personal knowledge is not bad faith. Failing to conduct a factual inquiry does not necessarily render the other investigative efforts inherently less than "thorough."

   c. **Good Faith Investigation**

Plaintiffs argue Murphy and Landen should be sanctioned because they knew the SLC did not conduct its investigation in good faith, as required by the second prong from *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1343 (Ohio Ct. App. 1990). As discussed above, if the SLC took Plaintiffs' factual allegations as true, then the SLC's investigation was mostly a cost-benefit analysis based on a legal investigation into remedies. Plaintiffs present considerable evidence that Murphy and Landen shaped the legal investigation with a foundational goal of finding a way

12

to get Plaintiffs' suit dismissed. If the SLC's investigation were largely based on the legal investigation, and the legal investigation had a predetermined goal, then it stands to reason that the SLC's investigation was not in good faith. Nonetheless, the issue at hand is not whether the investigation was in good faith, but whether Murphy and Landen should be sanctioned for representing to the Court that it was.

Shortly after the League hired Murphy's firm, Murphy emailed Williams' counsel, writing that the League did not want the litigation, even though Murphy had not communicated with anyone on the SLC apart from Brown.[4] [*See* Filing No. 313-2, at ECF p. 5 (Invoice for Nov. and Dec.); Filing No. 313-6, at ECF p. 2 (Invoice for Jan.).] That same day, January 5, Murphy emailed Swehla, telling him that Brown wants to "go after" Williams and that "we would like the whole case dismissed." [Filing No. 331-19, at ECF p. 1.] Swehla did most of the work: 61.3 hours compared to 10.9 and 4.7 hours respectively for Murphy and Landen. [Filing No. 313-2 (Invoice for Nov. and Dec.); Filing No. 313-6 (Invoice for Jan.).] True to his directive from Murphy, Swehla focused the vast majority of his research on finding a way to get Plaintiffs' suit dismissed. [*See* Filing No. 313-6; Filing No. 331-23 (Jan. 7, 2015, email from Swehla to himself listing search results showing case law on different dismissal routes).]

Murphy and Landen argue that their job was to be litigation counsel for the League, which meant developing and presenting a strategy in accordance with the League's wishes, and the League undisputedly wanted Plaintiffs' suit to go away. They contend they did not work for the SLC; they worked for the League and abided the League's wishes. According to Murphy and Landen, it was Ysursa's responsibility to advise the SLC.

---

[4] Murphy and SLC member Brown had a personal relationship, and Plaintiffs allege that Brown convinced the Board to hire Murphy to represent the League in Plaintiffs' suit. Murphy and Landen deny this, claiming the League hired them following Ysursa's recommendation.

13

Plaintiffs contend the distinction Murphy and Landen try to draw is meaningless because Murphy and Landen essentially controlled the SLC. Their argument falls short. Plaintiffs point to emails between Brown and Murphy leading into the SLC meetings on January 15 and 19. [Filing No. 331-25; Filing No. 331-26.] Murphy's handwritten notes reflect that they discussed each SLC member's position, for or against Plaintiffs' suit. [Filing No. 331-24, at ECF p. 1.] However, the SLC had already been selected, so it is not as if Murphy was trying to stack the SLC. Rather, the notes more readily appear to show Brown bringing Murphy up to speed, given that some of the members had been debating a suit against Defendants since as far back as June 2014.

Plaintiffs also note Brown's statement in an email that he will not try to get the SLC to decide whether to formally oppose Plaintiffs' suit at the January 15 meeting, but will "grease the skids" for the January 19 meeting that Landen and Swehla would attend. [Filing No. 331-25, at ECF p. 2.] However, the email is not as nefarious as Plaintiffs make it seem. Brown lists three agenda items, including whether the League is "willing to 'step into [Williams'] shoes' in the suit and continue the litigation while trying to seek a settlement with [Hanners] and [Zimmerman.]" [Id.] Brown later replied with an update, saying the SLC discussed four options, and seemed to be leaning toward seeking dismissal. [Filing No. 331-27, at ECF p. 1.] But he also noted the SLC was trying to get Plaintiffs to halt their efforts so the League could try to settle the claims. [Id.]

At the January 19 SLC meeting, Landen and Swehla explained four options to the SLC. [Filing No. 326-14, at ECF pp. 1-2.] The first was to do nothing and allow Plaintiffs' suit to continue under Williams' control. Second was to take over control of the derivative claims, but leave Williams in control of his personal claims against Defendants. Third, the League could file

a motion to dismiss. The meeting minutes show that the motion to dismiss would be based on whether Plaintiffs properly pleaded their complaint and whether Plaintiffs had standing. The fourth option would be to vote to approve Plaintiffs' demand and take over the whole lawsuit. Landen and Swehla also added that if the SLC were to go with option three, but lost the motion, the League could still move on to option four and take over the suit. The SLC unanimously voted to go with option three—a motion to dismiss. [*Id.* at ECF p. 2.] Murphy and Landen argue that the fact they presented the SLC with four options shows it was the SLC's determination, and they were not the puppet masters of the SLC. Plaintiffs reply that all three lawyers present recommended option three. The minutes even show that Ysursa advised the SLC to "listen to the attorneys." [*Id.*] Thus, they argue the lawyers drove the decision.

Nonetheless, Plaintiffs fail to show Murphy and Landen had such a substantial influence on the SLC that the distinction between their roles as litigation counsel to the League and Ysursa's role as counsel to the SLC is meaningless. Murphy and Landen were hired to manage the litigation on behalf of the League, so it follows that they would concentrate their efforts on achieving the litigation outcome the League wanted. Murphy and Landen did interact with the SLC, blurring the distinction. Still, Plaintiffs fail to show that Murphy and Landen's dismissal-oriented research and inclination so permeated the SLC that Murphy and Landen's reliance on the SLC was in bad faith.

Additionally, Murphy and Landen argue that the League's $100,000 fine against Hanners is evidence of a good faith investigation. Using internal remedies can be evidence of a good faith investigation. *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1344 (Ohio Ct. App. 1990). But Murphy and Landen misapply this principle from *Miller*. The fine came out of the Commissioner's investigation, not the SLC's, and the fine was not levied until after the SLC

15

made its decision. Thus, because the SLC could not have relied on the fine as part of its justification for not pursuing the claims, the fine does nothing to support Murphy and Landen's defense that the SLC acted in good faith.

### d. Independent, Disinterested trustees

Plaintiffs contend that Murphy and Landen knew that at least one of the SLC members was not independent or disinterested, which would mean Murphy and Landen's argument for deference to the SLC was made in bad faith. Regarding whether the SLC members were independent, Plaintiffs argue that Murphy and Landen repeatedly represented to the Court that the members were independent, but Murphy and Landen never checked to make sure this was true. To show that the SLC is not independent, the party making this assertion must show ties to the board of directors that go beyond incidental relationships with board members. *Miller v. Bargaheiser*, 591 N.E.2d 1339, 1343 (Ohio Ct. App. 1990). In its summary judgment entry, the Court found that not all of the SLC members were independent. [Filing No. 238, at ECF p. 23.]

However, to show that sanctions are justified based on bad faith, Plaintiffs must show Murphy and Landen's failures go beyond negligence. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013). Neither Murphy nor Landen (nor their colleague Swehla) vetted the SLC members for independence. Murphy and Landen contend that it was not their role to vet the SLC members. They claim instead that Ysursa had that responsibility as part of his role as counsel to and non-voting member of the SLC. While it may have been irresponsible for Murphy and Landen to assume the SLC members were independent, Plaintiffs fail to provide sufficient evidence that Murphy and Landen knew any member of the SLC was not independent from the Board or an otherwise interested party. As a result, Plaintiffs cannot in

16

this way show that Murphy and Landen's assertions that the SLC was independent were made in bad faith.

Regarding disinterestedness, Plaintiffs argue that Murphy and Landen knew SLC member Clint Brown had engaged in self-dealing, but nonetheless represented to the Court that all the SLC members were disinterested. However, any interest Brown had disappeared before the SLC was created. Brown had entered into negotiations with Kokomo and Zimmerman regarding the possibility of Brown starting a Kokomo team and leasing operations of the team to Zimmerman. The negotiations apparently floundered, because in September 2014, months before the SLC was created, Zimmerman and Kokomo reached a deal with a competing league. Thus, even if Murphy knew and participated in Brown's efforts, Brown was disinterested by the time he was named to the SLC.[5]

## IV.  Conclusion

Monetary sanctions against Murphy and Landen are not warranted. This litigation has been a long, difficult, and expensive fight. Undoubtedly, Murphy and Landen misfired along the way. But scorching this battlefield with a massive sanctions award is not justified. Therefore, for the reasons set forth above, Plaintiffs' motion for sanctions [Filing No. 311] should be denied.

---

[5] Plaintiffs' contention that Brown lied at his deposition about Murphy's involvement are disquieting. Murphy and Landen's argument that the questions were vague enough that the answers could be considered accurate is unpersuasive. However, Murphy and Landen did not represent Brown at the deposition, so they did not have a duty to correct the record. Further, they did not offer this testimony, and therefore did not violate Indiana Rule of Professional Responsibility 3.3(a)(3).

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1). Absent a showing of good cause, failure to file objections within 14 days after service shall constitute a waiver of subsequent review.

Date: 1/18/2019

_____
Tim A. Baker
United States Magistrate Judge
Southern District of Indiana

Distribution: All ECF-registered counsel of record by email.